IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF PENNSYLVANIA

JOSEPH MILTON KAPA, as

Administrator of the Estate of

JOSEPH MILTON KAPA, JR.,

      Plaintiff,

      vs.

JOHN A. PALAKOVICH,

SUPERINTENDENT PAUL K.

SMEAL, OFFICER GREENLEAF,

OFFICER NASRALLAH, SERGEANT

KUHNS, GEORGE WEAVER,

PRISON HEALTH SERVICES, INC.,

MENTAL HEALTH SERVICES, INC.,

DR. FRANZ BAUER,

      Defendants.

***FILED ELECTRONICALLY***

CIV. ACTION NO. 09-CV-371

The Hon. Sylvia Rambo

PLAINTIFFS' COUNTER STATEMENT OF FACTS IN RESPONSE TO THE AMENDED
STATEMENT OF MATERIAL FACTS OF DEFENDANTS MHM CORRECTIONAL
SERVICES, INC. AND FRANZ BAUER, M.D.

In response to Defendants MHM Correctional Services, Inc. and Franz Bauer, M.D. Amended Statement of Material Facts ("MHM Defendants' Statement of Facts"), plaintiffs respectfully submit this counter-statement of material facts pursuant to this Court's L.R. 56.1.[1]

1.      In response to paragraph 1 of MHM Defendants' Statement of Facts, Plaintiff admits  the statements contained therein.

2.      In response to paragraph 2 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

3.      In response to paragraph 3 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained in paragraph 1 through paragraph 91 of MHM Defendants' Statement of Facts.  However, Plaintiff notes that although paragraph 1 through paragraph 42 shed light on the mental health history of Joseph Kapa, that history is both prior to Mr. Kapa's time at SCI-Smithfield and prior to Mr. Kapa's parole and subsequent return to SCI-Smithfield as a parole violator.  The MHM Defendants refer to specific mental health incidents beginning in October of 1992, almost 15 years before Joseph Kapa committed suicide. Plaintiff does not dispute that Mr. Kapa was a mentally unstable individual who required attention from mental health professionals.   In fact, this is the very reason Mr. Kapa had an increased risk of suicide, of which the Defendants were aware, making them deliberately indifferent to that risk by their subsequent actions.  Paragraph 43 through paragraph 91 documents Mr. Kapa's time spent pre-parole at SCI-Smithfield.  Plaintiff further notes that paragraph 1 to paragraph 91 of MHM Defendants' Statement of Facts show that Joseph Kapa was admitted to the Psychiatric Observation Cell (POC) eleven times before his parole, almost all for threats to commit suicide.

---

[1] We refer to these defendants as the "MHM Defendants" because they either operate or are/were directly employed by MHM Correctional Services, Inc..

As the years progressed, Mr. Kapa's threats intensified and he began to act on them by cutting himself.  (¶39 and ¶73 of MHM Defendants' Statement of Facts).  Joseph Kapa was admitted to the POC at SCI-Smithfield five times before his parole for threatening to kill himself, including one time when Defendant Bauer commented in his notes that he ***knew*** Joseph Kapa would threaten suicide again.  (¶64 MHM Defendants' Statement of Facts).   Plaintiff does not dispute that the statements contained in these paragraphs are true, but rather observe that in light of this information, particularly that Mr. Kapa repeatedly threatened suicide and his threats escalated to self-harm, MHM and Dr. Bauer acted with deliberate indifference to the psychiatric needs of Joseph Kapa which ultimately led to his death.

4.      In response to paragraph 4 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

5.      In response to paragraph 5 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

6.      In response to paragraph 6 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

7.      In response to paragraph 7 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

8.      In response to paragraph 8 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

9.      In response to paragraph 9 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

10.     In response to paragraph 10 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

11.     In response to paragraph 11 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

12.     In response to paragraph 12 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

13.     In response to paragraph 13 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

14.     In response to paragraph 14 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

15.     In response to paragraph 15 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

16.     In response to paragraph 16 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

17.     In response to paragraph 17 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

18.     In response to paragraph 18 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

19.     In response to paragraph 19 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

20.      In response to paragraph 20 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

21.      In response to paragraph 21 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

22.      In response to paragraph 22 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

23.      In response to paragraph 23 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

24.      In response to paragraph 24 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

25.      In response to paragraph 25 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

26.      In response to paragraph 26 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

27.      In response to paragraph 27 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

28.      In response to paragraph 28 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

29.      In response to paragraph 29 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

30.     In response to paragraph 30 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

31.     In response to paragraph 31 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

32.     In response to paragraph 32 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

33.     In response to paragraph 33 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.  Plaintiff notes, however, that this was precisely the method of suicide Joseph Kapa used on 6/25/2007 to commit suicide successfully. (Plaintiff's Exhibit 12, Kerry Hughes Expert Report, p. 8).  This shows that the MHM Defendants knew not only of Mr. Kapa's increased risk of suicide, but they were aware of the very method he would use to commit suicide.

34.     In response to paragraph 34 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

35.     In response to paragraph 35 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

36.     In response to paragraph 36 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

37.     In response to paragraph 37 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

38.     In response to paragraph 38 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

39.     In response to paragraph 39 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

40.     In response to paragraph 40 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

41.     In response to paragraph 41 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

42.     In response to paragraph 42 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

43.     In response to paragraph 43 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.  Plaintiff notes, however, that this was the beginning of Joseph Kapa's doctor-patient relationship with Dr. Eugene Polmueller (psychiatrist), who was still caring for Joseph Kapa at the time of his death.  (Plaintiff's Exhibit 8, Psychiatric Observation Monitoring Form dated 6/22/07).

44.     In response to paragraph 44 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

45.     In response to paragraph 45 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

46.     In response to paragraph 46 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

47.     In response to paragraph 47 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

48.     In response to paragraph 48 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

49.     In response to paragraph 49 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

50.     In response to paragraph 50 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

51.     In response to paragraph 51 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

52.     In response to paragraph 52 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

53.     In response to paragraph 53 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

54.     In response to paragraph 54 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.  Plaintiff notes, however, that this shows knowledge on the part of MHM and Mr. Kapa's medical providers that Joseph Kapa was at a heightened risk of death by suicide.

55.     In response to paragraph 55 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

56.     In response to paragraph 56 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

57.     In response to paragraph 57 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

58.     In response to paragraph 58 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

59.     In response to paragraph 59 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.  Plaintiff notes, however, that Defendant Kuhns labeled Joseph Kapa as a "homosexual" in his testimony. (Plaintiff's Exhibit 21, Kuhns Deposition, 14:14-15:10).

60.     In response to paragraph 60 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

61.     In response to paragraph 61 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

62.     In response to paragraph 62 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.  Plaintiff notes, however, that the MHM Defendants' Statement of Facts shows that Defendant Bauer had a long history of treating Joseph Kapa, which spanned from 2003-2007 (although Mr. Kapa was on parole for almost a year of that time).  Dr. Bauer was aware that Mr. Kapa had an increased risk of suicide.

63.     In response to paragraph 63 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

64.     In response to paragraph 64 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.  Plaintiff notes, however, that Defendant Bauer was aware, and made other MHM mental health providers aware through his note that Joseph Kapa was, "…not safe for himself and others." "If it (threatening self-harm) happens again, which it will, we know more how to manage the storm." (Plaintiff's Exhibit 30, Inpatient Unit Summary of Dr. Bauer, dated 1/9/04). This shows that Defendant Bauer was aware that Mr. Kapa had a particular vulnerability to suicide.

65.     In response to paragraph 65 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

66.     In response to paragraph 66 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

67.     In response to paragraph 67 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

68.     In response to paragraph 68 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

69.     In response to paragraph 69 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

70.     In response to paragraph 70 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

71.     In response to paragraph 71 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

72.     In response to paragraph 72 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

73.     In response to paragraph 73 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

74.     In response to paragraph 74 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

75.     In response to paragraph 75 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

76.     In response to paragraph 76 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

77.     In response to paragraph 77 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

78.     In response to paragraph 78 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

79.     In response to paragraph 79 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

80.     In response to paragraph 80 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

81.     In response to paragraph 81 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

82.     In response to paragraph 82 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

83.     In response to paragraph 83 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

84.     In response to paragraph 84 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

85.     In response to paragraph 85 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

86.     In response to paragraph 86 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

87.     In response to paragraph 87 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

88.     In response to paragraph 88 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

89.     In response to paragraph 89 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

90.     In response to paragraph 90 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

91.     In response to paragraph 91 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

92.     In response to paragraph 92 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.  Plaintiff notes that this was the first time Defendant Bauer saw Joseph Kapa after his return to SCI-Smithfield as a parole violator.

93.     In response to paragraph 93 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.  Plaintiff notes, however, that although Defendant Bauer categorized Joseph Kapa as a "heavy substance abuser," (¶88, MHM Defendants' Statement of Facts) he increased Mr. Kapa's medications upon his request.  This substantially calls into question the judgment of Dr. Bauer when it came to dealing with patients.

94.     In response to paragraph 94 of MHM Defendants' Statement of Facts, Plaintiff admits the substance of the statements contained therein.  Plaintiff disputes, however, that Joseph Kapa told Defendant Bauer he was up all night "taking care of his kids," but instead that he was up all night "making gifts for his kids."  (MHM Defendants' Exh. A, p. 317).

95.     In response to paragraph 95 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.  Plaintiff notes, however, that although Dr. Dominguez advised Joseph Kapa to wait to discuss medication changes with Dr. Bauer, Dr. Bauer never returned to SCI-Smithfield. (¶ 94 MHM Defendants' Statement of Facts).

96.     In response to paragraph 96 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.  Plaintiff notes, however, that Dr. Mellon added to Joseph Kapa's medications Prozac, Klonopin and Elavil (in addition to the Benadryl Dr. Bauer had already prescribed and increased).  Mellon's notes indicate he thought Mr. Kapa had bipolar disorder.  (Plaintiff's Exhibit 12, Kerry Hughes Expert Report, p. 3). Plaintiff also notes that twelve weeks earlier, Dr. Bauer diagnosed Joseph Kapa as having mood disorder and borderline

personality disorder. (¶ 93 MHM Defendants' Statement of Facts).  This contradiction in diagnoses by mental health professionals treating Mr. Kapa calls into question whether Mr. Kapa was receiving consistent or appropriate mental health care, especially with his heightened risk of suicide.

97.     In response to paragraph 97 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.  Plaintiff notes, however, that on April 16, 2007 Joseph Kapa alleged abuse at the hands of the Allegheny County Sheriff's Department while he was there for the prior three weeks participating in court proceedings. This alleged abuse, resulting in rib pain, abdominal pain, and blood in his urine, led to numerous subsequent visits with medical staff and correspondences with prison authorities over what was to be done regarding Mr. Kapa's abuse.  SCI-Smithfield authorities deferred the matter to the Allegheny County Sheriff's Department. (Plaintiff's Exhibit 14, Kathryn Burns Expert Report, p. 3).   While at Allegheny County, Trazodone and Dilantin were added to Mr. Kapa's list of medications.  (Plaintiff's Exhibit 12, Kerry Hughes Expert Report p. 3).  Although he was stable on both Trazodone and Elavil, Dr. Barbara Davis was concerned that he was taking both, and asked Mr. Kapa's preference.  He informed her that he preferred Trazodone to Elavil, but Dr. Davis discontinued Trazodone and continued Elavil despite her asking and noting in her records his preference. (Plaintiff's Exhibit 12, Kerry Hughes Expert Report, p. 3).  This mistake is indicative of standard of care provided to inmates at SCI-Smithfield by MHM and DOC providers.

98.     In response to paragraph 98 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

99.     In response to paragraph 99 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.  Plaintiff notes, however, that although Dr. Polmueller realized that Joseph Kapa was receiving an incorrect level of medications for his diagnosis, he continued Mr. Kapa on those medications.  This is evidence of the poor standard of care given to inmates by MHM providers.

100.     In response to paragraph 100 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein. Plaintiff notes, however, that there is no record, nor does Dr. Polmueller testify as having recalled whether a follow up call to the psychiatrist regarding Mr. Kapa's medication ever occurred.

101.     In response to paragraph 101 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.  Plaintiff notes, however, that Mr. Kapa was seen by A. Shope, PSS due to his concerns regarding his medications on the previous day, April 30, 2007. Shope's progress notes indicated that Joseph Kapa would be referred to Dr. Mellon regarding this issue.  (Plaintiff's Exhibit 12, Kerry Hughes Expert Report, p. 4).  There was no documentation of a clinical contact with Mellon on that day, however, an order was issued for Trazodone by Dr. Mellon on that day.  (Plaintiff's Exhibit 12, Kerry Hughes Expert Report, p. 4).  In Mellon's progress notes he commented that he thought Joseph Kapa had bipolar disorder and also that Mr. Kapa was "Not Stable." (Plaintiff's Exhibit 12, Kerry Hughes Expert Report, p. 4).  This is further evidence that MHM and DOC medical staff were aware not only of the dire circumstances of Mr. Kapa's mental health, but also that he was having problems with his medications.

102.     In response to paragraph 102 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

103.     In response to paragraph 103 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

104.     In response to paragraph 104 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

105.     In response to paragraph 105 of MHM Defendants' Statement of Facts, Plaintiff disputes in part and admits in part the statements contained therein.  On June 12, 2007 Joseph Kapa was approved for parole by the Unit Team (which included Defendants Smeal and Palakovich).  (Plaintiffs Exhibit 31, Parole Vote Sheet, dated 6/12/07).  On June 14, while on the E Block, B wing of general population, Joseph Kapa received a misconduct at 3:20 pm for "Using Abusive, Obscene or Inappropriate Language to an Employee" and for "Refusing to Obey and Order."  COI Bonneau indicated on misconduct report A949034 that while he was on E Block, B wing doing chow relief, Mr. Kapa was let out of his cell (EB-13) for block work. Mr. Kapa came out of his cell wearing his Walkman radio and headphones.  Bonneau ordered Mr. Kapa to take off his headphones and according to Bonneau, Mr. Kapa stuck his hand into Bonneau's face, stated "I am not listening to your dumbass, motherfucker," and began to walk past Bonneau to the control window to talk to Sgt. Bulick.  Bonneau then gave Mr. Kapa orders to return to his cell on lockup, but Mr. Kapa refused and continued walking to the control window, while yelling for Bonneau to get away from him.  Sgt. Bulick ordered Mr. Kapa to return to his cell, which he did.  (Plaintiff's Exhibit 15, Misconduct Report dated 6/14/07). Following this incident, Mr. Kapa was transferred to the RHU (Restricted Housing Unit).  As a condition to receiving parole, Mr. Kapa was aware that he must have no misconducts on his record (Plaintiff's Exhibit 12, Kerry Hughes Expert Report, p. 4), and this was his first misconduct since his return to SCI-Smithfield as a parole violator. (Plaintiffs' Exhibit 24,

Psychiatric Evaluation for CCC and Outside Clearance and Parole, p. 1).  Shortly after being

transferred to the RHU, Mr. Kapa made a suicide threat in the RHU to cut his wrist or hang

himself after receiving the misconduct. (Plaintiff's Exhibit 12, Kerry Hughes Expert Report, p.

5).  After a Suicide Risk Indicator Checklist was completed by Officer Wright at 4:56 pm,

Joseph Kapa was admitted to the POC at 5:05 pm by LPN Boyer.  (Plaintiffs' Exhibit 7, Suicide

Risk Indicator Checklist dated 6/14/07).  Dr. Polmueller provided a verbal order for admission to

the POC with 15 minute observations. (Plaintiff's Exhibit 12, Kerry Hughes Expert Report, p. 5).

Mr. Kapa remained in the POC until June 20, 2007.  (Plaintiff's Exhibit 12, Kerry Hughes Expert

Report, p. 6).  On June 15, 2007, Mr. Kapa reported to A. Shope, PSS that he "told them I'd kill

myself if they put me in RHU." (Plaintiff's Exhibit 12, Kerry Hughes Expert Report, p. 5).

Nursing notes indicated that Mr. Kapa was concerned about the misconduct negatively affecting

his parole and he began a hunger strike, stating he was not eating until they take care of the

misconduct. (Plaintiff's Exhibit 12, Kerry Hughes Expert Report, p. 5).  Mr. Kapa's hunger

strike lasted until June 20, 2007 and he missed 15 meals. (Plaintiffs' Exhibit 10, Joseph Kapa

DC-17X Forms from POC, dated 6/14 through 6/20).  A Disciplinary Hearing on Misconduct

was held in the POC at 10:30 am on June 18, 2007.  Mr. Kapa pled guilty to both misconduct

charges, stating "We don't' get along, the only thing I said to him was I'm not talking to you."

The Hearing Examiner believed COI Bonneau's report over the denial of Mr. Kapa, finding that

in his report, Bonneau presented a preponderance of evidence to establish that Mr. Kapa refused

orders to go to lockup.  The Hearing Examiner found Mr. Kapa guilty of "Refusing to Obey an

Order," and dismissed the charge of "Using Abusive, Obscene or Inappropriate Language to an

Employee."  (Plaintiff's Exhibit 25, Disciplinary Hearing Report dated 6/18/07).  Mr. Kapa then

appealed the Misconduct Hearing Decision stating, "I'm not appealing the decision but am

asking for leniency since I have been staffed for Re parole. I have completed Parole Violators group and am currently in Batterers Group.  I have not had a misconduct since 2004. I really want to go back home to my family and my unit team has supported me for parole.  (Plaintiff's Exhibit 26, Misconduct Hearing Appeal Leniency Request). Although the misconduct was ultimately reduced, Mr. Kapa was never aware of the reduction before he committed suicide on June 25, 2007.  (Plaintiff's Exhibit 20, Inmate Request to Staff Member Mills).  Mr. Kapa was released from POC immediately after ending his hunger strike of fifteen meals by a verbal order from Dr. Polmueller.  (Plaintiff's Exhibit 12, Kerry Hughes Expert Report, p. 6).

106.    In response to paragraph 106 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

107.    In response to paragraph 107 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

108.    In response to paragraph 108 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

109.    In response to paragraph 109 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

110.    In response to paragraph 110 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

111.    In response to paragraph 111 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

112.    In response to paragraph 112 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

113.    In response to paragraph 113 of MHM Defendants' Statement of Facts, Plaintiff admits in part and disputes in part the statements contained therein.  After Joseph Kapa's verbal discharge from the POC on June 20, 2007 (Plaintiff's Exhibit 36, Progress Note for Discharge dated 6/20/2007), he was sent back to the RHU.  At 7:30 a.m. on June 21, 2007, Mr. Kapa was seen by S. Troutman, PSS at the request of a nurse in H/A block housing unit.  **Mr. Kapa was having racing thoughts and reportedly threatened to hang himself if left in his cell.**  Additionally, Mr. Kapa reported that officers were "messing" with him. (Plaintiff's Exhibit 12, Kerry Hughes Expert Report, p. 6).  The psychologist's assessment was that Mr. Kapa was malingering and making threats of suicide.   Mr. Kapa was re-admitted to the POC. (Plaintiff's Exhibit 10, DC-17X POC Forms 6/21/2007).  Mr. Kapa remained in POC due to suicide threats until June 22, 2007, when Dr. Polmueller ordered Joseph Kapa's discharge from the POC.  Mr. Kapa was to be returned to the RHU with 72 hours of 15 minute checks (Plaintiff's Exhibit 12, Kerry Hughes Expert Report, p. 6).  A release from the POC merely one day after being re-admitted for again threatening suicide shows that MHM Staff was not taking Mr. Kapa's threats of suicide seriously.

114.    In response to paragraph 114 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

115.    In response to paragraph 115 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

116.    In response to paragraph 116 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

117.    In response to paragraph 117 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

118.    In response to paragraph 118 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

119.    In response to paragraph 119 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

120.    In response to paragraph 120 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

121.    In response to paragraph 121 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

122.    In response to paragraph 122 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

123.    In response to paragraph 123 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

124.    In response to paragraph 124 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

125.    In response to paragraph 125 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

126.    In response to paragraph 126 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.  Plaintiff notes, however, that although Mr. Kapa may have denied any self-harmful intent on June 22, 2007 when he was released from the POC, he threatened suicide and was admitted to the POC for constant observation twice in the eight days leading up to his final release from the POC, which he ultimately achieved. (Plaintiff's Exhibit 10, Joseph Kapa DC-17X Forms from POC dated 6/14/07 through 6/22/07).  This shows both that Mr. Kapa had a particular vulnerability to suicide and that MHM was aware of Mr. Kapa's vulnerability.  Releasing Mr. Kapa shows that MHM acted with reckless indifference towards that vulnerability.

127.    In response to paragraph 127 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

128.    In response to paragraph 128 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

129.    In response to paragraph 129 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

130.    In response to paragraph 130 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

131.    In response to paragraph 131 of MHM Defendants' Statement of Facts, Plaintiff admits that Defendant Bauer ***testified to his opinion*** of such.  Plaintiff denies the accuracy of Defendant Bauer's statement that he "Probably did him more good than the medication he got."

132.     In response to paragraph 132 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.  Plaintiff notes, however, that when Joseph Kapa returned to SCI-Smithfield as a parole violator, Defendant Bauer recognized that Mr. Kapa was in "crisis."

133.     In response to paragraph 133 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.  Plaintiff notes, however, that Mr. Kapa was not seen daily at any point of his incarceration, including when official prison policy dictated that he should be. (Plaintiff's Exhibit 8, Psychiatric Observation Monitoring Forms dated 6/22/07 to 6/25/07).  Official prison policy was not the policy, or the custom that was in place at the prison. The policy that prevailed was to take Mr. Kapa's threats of suicide lightly because he had made threats without succeeding before.

134.     In response to paragraph 134 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

135.     In response to paragraph 135 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

136.     In response to paragraph 136 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

137.     In response to paragraph 137 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

138.     In response to paragraph 138 of MHM Defendants' Statement of Facts, Plaintiff admits that Defendant Bauer *testified* as such.  However, Plaintiff disputes that the statement of

Defendant Bauer is the proper way to determine if someone is suicidal.  Defendant MHM and Dr. Bauer are bound to follow the policies of the Department of Corrections under their contract with the Department of Corrections.[2]  According to the mental health care manual in place at SCI-Smithfield, "Every suicide attempt, including gestures, shall be taken seriously."  (Plaintiff's Exhibit 5, Access to Mental Health Care Manual, p. 25).  Dr. Bauer's reference in his testimony to inmates "playing a game" by threatening suicide clearly shows his lack of serious attention to the suicidal gestures of inmates, particularly Mr. Kapa.

139.    In response to paragraph 139 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

140.    In response to paragraph 140 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.  Plaintiff notes, however, that in the Comprehensive Medical Services Agreement Between the Department of Corrections and MHM (Plaintiff's Exhibit 27, Comprehensive Medical Services Agreement Between the Department of Corrections and MHM), MHM is bound to perform all the services described in the Department of Corrections Request for Proposals and the MHM Proposal, in addition to being bound to follow all DOC, BHCS policies and clinical guidelines for treatment of psychiatric disorders (Plaintiff's Exhibit 28, Department of Corrections Request for Proposals, p. 276).  This clearly shows that although MHM may have been bound to follow the rules set forth by the DOC, they were still bound to follow clinical guidelines for treatment of psychiatric disorders and cannot claim that they lack any responsibility for the professional services they provide.

---

[2] The Comprehensive Medical Services Agreement Between the Department of Corrections and MHM describes the services MHM is to perform as those described in the Department of Corrections Request for Proposals and the MHM Proposal. (Plaintiff's Exhibit 27, Comprehensive Medical Services Agreement Between the Department of Corrections and MHM, p. 292).  The Department of Corrections Request for Proposals states that "The mental health vendor shall follow all DOC, BHCS policies and clinical guidelines for treatment of psychiatric disorders." (Plaintiff's Exhibit 28, Department of Corrections Request for Proposals, p. 276).

141.    In response to paragraph 141 of MHM Defendants' Statement of Facts, Plaintiff

disputes the statements contained therein.  In paragraph 141 of MHM Defendants' Statement of

Facts, Defendants claim that MHM has no specific policy for preventing the suicide of inmates,

but in paragraph 142, Defendants claim that MHM does have its own policies and procedures to

use unless otherwise specified.  If MHM had no policies in place to prevent the suicide of

inmates, and they contracted to provide mental health care for inmates, they would be derelict in

their services as a mental health services provider.  If they followed the standards imposed by the

Department of Corrections, as they claim, they would be required to follow all clinical guidelines

for treating psychiatric disorders, not just those that the DOC specified. (Plaintiff's Exhibit 28,

Department of Corrections Request for Proposals, p. 276).

142.    In response to paragraph 142 of MHM Defendants' Statement of Facts, Plaintiff

disputes the statements contained therein.  Once again, while the DOC may require that MHM

follow DOC policies, the policies in place state that MHM must follow not only DOC policies,

but also clinical guidelines for treatment of psychiatric disorders.  (Plaintiff's Exhibit 28,

Department of Corrections Request for Proposals, p. 276).  MHM cannot escape the professional

standards of the field in which it contracts as a professional service provider.

143.    In response to paragraph 143 of MHM Defendants' Statement of Facts, Plaintiff

admits the statements contained therein.  Plaintiff disputes, however, that this procedure was

followed. Joseph Kapa's "Psychiatric Observation Monitoring Forms," which chronicled the

fifteen minute watch cycle of the last eleven days of his life were incomplete, pre-filled and

vague (for instance, often the same notations would be made over and over again).  (Plaintiff's

Exhibit 8, Psychiatric Observation Monitoring Forms dated 6/14/07 to 6/25/07).  Most notably,

the day Mr. Kapa committed suicide, there was an hour of fifteen minute watches that never took place.  (Plaintiff's Exhibit 8, Psychiatric Observation Monitoring Forms, dated 6/25/07).

144.   In response to paragraph 144 of MHM Defendants' Statement of Facts, Plaintiff disputes the statements contained therein.  The most accurate record of Mr. Kapa's last days alive is the record of fifteen minute watches that were supposed to ensure his safety.  This detailed record shows that Mr. Kapa was last visited by a medical health professional on 6/22/07.  (Plaintiff's Exhibit 8, Psychiatric Observation Monitoring Forms, dated 6/22/07 through 6/25/07).

145.   In response to paragraph 145 of MHM Defendants' Statement of Facts, Plaintiff admits that Dr. Polmueller *testified to his opinion* as such.

146.   In response to paragraph 146 of MHM Defendants' Statement of Facts, Plaintiff admits to the statements contained therein. Plaintiff disputes, however, that this is the *only* reason why Dr. Bauer's employment was discontinued at SCI-Smithfield.

147.   In response to paragraph 147 of MHM Defendants' Statement of Facts, Plaintiff admits that Dr. Polmueller *testified*[3] to the statements contained therein.

148.   In response to paragraph 148 of MHM Defendants' Statement of Facts, Plaintiff admits that Dr. Polmueller *testified as to his opinion* regarding why Mr. Kapa's diagnosis was difficult to discern.

149.   In response to paragraph 149 of MHM Defendants' Statement of Facts, Plaintiff admits that Dr. Polmueller *testified* to the statements contained therein.

---

[3] Emphasis is added to show that Plaintiff disputes the testimony of several witnesses.

150.    In response to paragraph 150 of MHM Defendants' Statement of Facts, Plaintiff admits that Dr. Polmueller ***testified*** to the statements contained therein.

151.    In response to paragraph 151 of MHM Defendants' Statement of Facts, Plaintiff admits that Dr. Polmueller ***testified as to his opinion*** regarding why Mr. Kapa's diagnosis varied by practitioner.

152.    In response to paragraph 152 of MHM Defendants' Statement of Facts, Plaintiff admits that Dr. Polmueller ***testified as to his opinion*** of Mr. Kapa's personality and why that would make him difficult to diagnose.

153.    In response to paragraph 153 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

154.    In response to paragraph 154 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

155.    In response to paragraph 155 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

156.    In response to paragraph 156 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

157.    In response to paragraph 157 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

158.    In response to paragraph 158 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

159.     In response to paragraph 159 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

160.     In response to paragraph 160 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

161.     In response to paragraph 161 of MHM Defendants' Statement of Facts, Plaintiff admits that Plaintiff is not in possession of any documents that show that there were other suicides at SCI-Smithfield between 2003 and when Joseph Kapa committed suicide on June 25, 2007.

162.     In response to paragraph 162 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

163.     In response to paragraph 163 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.  Plaintiff notes, however, that the doctor who makes the decision to discharge an inmate from the POC is a psychiatrist.  (Plaintiff's Exhibit 2, Palakovich Deposition, at 49). Plaintiff also notes that Defendant Palakovich *testified as to his opinion* that the CO's were generally familiar with the inmates and they knew their behaviors and what to watch out for.

164.     In response to paragraph 164 of MHM Defendants' Statement of Facts, Plaintiff admits that Defendant Palakovich *testified* as to statements contained therein.

165.     In response to paragraph 165 of MHM Defendants' Statement of Facts, Plaintiff disputes the statements contained therein.  Although the official policy of the prison was to have suicide risk indicator checklists filled out for every admission to the RHU, that was not the

custom or practice that was in place.  Joseph Kapa was transferred from the RHU to the POC on June 14, 2007 and there was a suicide risk indicator checklist filled out that day.  (Plaintiff's Exhibit 7, Suicide Risk Indicator Checklist, dated 6/14/07).  However, Mr. Kapa was transferred back to the RHU on June 20, 2007.  (Plaintiff's Exhibit 9, DC-17X Form from RHU, dated 6/20).  There was no suicide risk indicator checklist filled out at this transfer.  Mr. Kapa was transferred back to the POC the next day, and back to the RHU the day after that, June 22, 2007.  (Plaintiff's Exhibit 9, DC-17X Form from RHU, dated 6/22/07).  Once again, there was no suicide risk indicator checklist filled out for this re-admission to the RHU.  The official policy was not the practice that was followed in this circumstance.

166.    In response to paragraph 166 of MHM Defendants' Statement of Facts, Plaintiff disputes the statements contained therein.  Once again, although it may have been the official prison policy to have a mental health professional check up on an inmate transferred from the POC to the RHU, the last visit documented on the fifteen minute observation "Psychiatric Observation Monitoring Forms" for Mr. Kapa the last eleven days of his life was on 6/22/07, when his 72-hour fifteen minute watch began.  (Plaintiff's Exhibit 8, Psychiatric Observation Monitoring Forms, dated 6/22/07 to 6/25/07).

167.    In response to paragraph 167 of MHM Defendants' Statement of Facts, Plaintiff admits that Defendant Palakovich *testified* as to statements contained therein.

168.    In response to paragraph 168 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

169.    In response to paragraph 169 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

170.    In response to paragraph 170 of MHM Defendants' Statement of Facts, Plaintiff admits in part and disputes in part the statements contained therein.  In dispute to the summary of Defendant Weaver's duties, Plaintiff notes that Defendant Weaver, as health care administrator, was the coordinator of all the activities in the medical department, was liaison between the Department of Corrections and contracted staff, including MHM; was responsible for reviewing policies and procedures; and was responsible for reviewing inmate health care needs, as well as taking the appropriate actions in response thereto. (Plaintiff's Exhibit 1, George Weaver Deposition, 10:6-10:15).  In fact, anything that had to do with health care went through George Weaver. (Plaintiff's Exhibit 1, George Weaver Deposition, 11:22-11:24).  George Weaver received and responded to inmate grievances regarding medical and medication issues. (Plaintiff's Exhibit 1, George Weaver Deposition, 27:3-27:10). George Weaver, on numerous occasions, responded to Joseph Kapa's grievances regarding his medications, his assault by Allegheny County Sheriffs, and other issues. (Plaintiff's Exhibit 1, George Weaver Deposition, at 38).  Defendant Weaver was responsible for more than reviewing policies and procedures.  He was personally familiar with Mr. Kapa and the problems he was having at SCI-Smithfield.

171.    In response to paragraph 162 of MHM Defendants' Statement of Facts, Plaintiff admits that Defendant Weaver **testified** as such.

172.    In response to paragraph 172 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

173.    In response to paragraph 173 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

174.    In response to paragraph 174 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

175.    In response to paragraph 175 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

176.    In response to paragraph 176 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

177.    In response to paragraph 177 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

178.    In response to paragraph 178 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.  Plaintiff notes that Joseph Kapa was admitted to, and released from, the POC eleven times before his parole in 2005. (MHM Defendants' Statement of Facts, ¶¶ 1-91) After his return to prison as a parole violator in 2006, Mr. Kapa was admitted to the POC twice.  He was admitted first on June 14, 2007 for threatening to commit suicide, where he was kept under observation for seven days until his release on June 20, 2007.  Joseph Kapa was in the RHU for less than a day when he indicated that he was suicidal and he was going to hang himself.  Mr. Kapa was admitted to the POC a second time on June 21, 2007 where he stayed under observation until June 22, 2007 at 6:06 pm.  He killed himself less than 72 hours after being released from the POC.  (Plaintiff's Exhibit 10, DC-17X Forms from POC, dated 6/14/07 through 6/25/07).

179.    In response to paragraph 179 of MHM Defendants' Statement of Facts, Plaintiff disputes the statements contained therein.  Defendant Smeal testified that RHU policy requires that officers make a round through the unit once every half an hour.  The guards carry wands

which must be touched to fixed points around the unit and make sure they are doing their rounds. (Plaintiff's Exhibit 29, Smeal Deposition, p.49-50).  However, John Diaz testified that it was not unusual for a guard to do rounds, but not look in anyone's cell, nor was it unusual for guards to come around once an eight our shift and check into the electronic check point multiple times. (Plaintiff's Exhibit 11, John Diaz Deposition, 29:13-30:24).

180.    In response to paragraph 180 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

181.    In response to paragraph 181 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

182.    In response to paragraph 182 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

183.    In response to paragraph 183 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

184.    In response to paragraph 184 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

185.    In response to paragraph 185 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

186.    In response to paragraph 162 of MHM Defendants' Statement of Facts, Plaintiff admits that Defendant Kuhns *testified* as such.

187.    In response to paragraph 187 of MHM Defendants' Statement of Facts, Plaintiff disputes the statements contained therein.  Defendant Palakovich testified in his deposition that

suicide prevention and intervention training lasted one hour. (Plaintiff's Exhibit 2, Palakovich Deposition, p. 40:2-40:3).

188.    In response to paragraph 188 of MHM Defendants' Statement of Facts, Plaintiff admits that Defendant Kuhns *testified* that is how he acted with suicidal inmates.

189.    In response to paragraph 189 of MHM Defendants' Statement of Facts, Plaintiff admits that Defendant Kuhns *testified* that is how he acted with suicidal inmates.

190.    In response to paragraph 190 of MHM Defendants' Statement of Facts, Plaintiff admits that Defendant Kuhns *testified* that was the DOC policy in 2007 and SCI-Smithfield no longer has that policy.

191.    In response to paragraph 191 of MHM Defendants' Statement of Facts, Plaintiff disputes the statements contained therein.  Defendant Kuhns testified that when an inmate was on fifteen minute watches, every fifteen minutes a guard would check on him and document what he was doing.  However, the "Psychiatric Observation Monitoring Form" for 6/25/07 shows that there is an hour that is unaccounted for on the very day of Mr. Kapa's suicide. (Plaintiff's Exhibit 8, Psychiatric Observation Monitoring Form, dated 6/25/07).

192.    In response to paragraph 192 of MHM Defendants' Statement of Facts, Plaintiff disputes the statements contained therein.  Regarding tier checks, John Diaz testified that it was not unusual for a guard to do rounds, but not look in anyone's cell.  Nor was it unusual for guards to come around once an eight our shift and check into the electronic check point multiple times. (Plaintiff's Exhibit 11, John Diaz Deposition, 29:13-30:24).

193.     In response to paragraph 193 of MHM Defendants' Statement of Facts, Plaintiff disputes the statements contained therein.  Defendant Kuhns testified that Mr. Kapa never complained to him about his medication.  However, John Diaz testified "…the main thing I remember about [Mr. Kapa] is he was constantly complaining about the medication. They're giving him the wrong medication."  Additionally, Mr. Diaz testified that Mr. Kapa "complained daily about his medication." (Plaintiff's Exhibit 11, John Diaz Deposition, 23:13-24:12).

194.     In response to paragraph 194 of MHM Defendants' Statement of Facts, Plaintiff admits that Defendant Kuhns *testified* as such.

195.     In response to paragraph 195 of MHM Defendants' Statement of Facts, Plaintiff admits that Defendant Kuhns *testified* as such.

196.     In response to paragraph 196 of MHM Defendants' Statement of Facts, Plaintiff admits that Defendant Kuhns *testified* as such.

197.     In response to paragraph 197 of MHM Defendants' Statement of Facts, Plaintiff admits that Defendant Kuhns *testified* as to his opinion that inmates who commit suicide do not first make suicide threats. Plaintiff disputes the accuracy of Defendant Kuhns' opinion, however, because Joseph Kapa made many suicide threats, including at least two in the eleven days preceding his death, and then followed through with successfully committing suicide. (Plaintiff's Exhibit 12, Expert Report of Kerry Hughes, p. 5-6).

198.     In response to paragraph 198 of MHM Defendants' Statement of Facts, Plaintiff disputes the statements contained therein.  Defendant Kuhns testified, "Kapa, he killed himself and didn't say a word; had no idea." (Plaintiff's Exhibit 21, Kuhns Deposition, p. 58).  However, Lamont Bullock testified that Mr. Kapa twice cried out to Defendant Kuhns on the day he died

(Plaintiff's Exhibit 4, Lamont Bullock Deposition, 18:25-19:10) after he threatened suicide to Defendant Greenleaf and Defendant Greenleaf responded that he didn't give a fuck. (Plaintiff's Exhibit 4, Lamont Bullock Deposition at 17:20-18:3). Additionally, John Diaz testified, "I remember the last four days [of Mr. Kapa's life]…he kept harping on the staff, I need to see a psych., I need to see a psych. Or my unit manager, Duck, but he kept saying that for like the last four days of his life, and the guards were like yeah, well, he's not here, no one can talk to you, and they blew him off." (Plaintiff's Exhibit 11, John Diaz Deposition, 27:6-27:14). John Diaz also testified that on the day Mr. Kapa died, he again was asking Sergeant Kuhns to see the "psych." or talk to the unit manager." (Plaintiff's Exhibit 11, John Diaz Deposition, p. 28:18-29:11).

199.    In response to paragraph 199 of MHM Defendants' Statement of Facts, Plaintiff disputes in part and admits in part the statements contained therein. Plaintiff disputes the fact that guards at SCI-Smithfield followed prison procedure and performed rounds every 30 minutes. John Diaz testified that it was not uncommon for guards to do rounds and not look into anyone's cell, nor was it uncommon for guards to come around once during an eight hour shift and check in to the check point multiple times. (Plaintiff's Exhibit 11, John Diaz Deposition, 29:13-30:24).

200.    In response to paragraph 200 of MHM Defendants' Statement of Facts, Plaintiff admits that Defendant Kuhns *testified* as such.

201.    In response to paragraph 201 of MHM Defendants' Statement of Facts, Plaintiff admits that Defendant Kuhns *testified* that he always responded when an inmate either told or showed him with his actions that he was suicidal. However, Plaintiff disputes the veracity of this

statement.  Plaintiff believes that the cries Lamont Bullock heard from Mr. Kapa to Defendant

Kuhns (Plaintiff's Exhibit 4, Lamont Bullock Deposition, 18:25-19:10) should have led

Defendant Kuhns, coupled with Mr. Kapa's recent suicidal behavior and admissions to the POC,

to understand that he was suicidal.

202.    In response to paragraph 202 of MHM Defendants' Statement of Facts, Plaintiff

disputes the statements contained therein.  Defendant Kuhns claimed in his testimony that in the

days before Mr. Kapa killed himself, neither he nor any other inmate suggested to Kuhns that

Mr. Kapa was suicidal, that he had thoughts of self-harm, or that he had any problems with his

medications.  However, John Diaz testified "…the main thing I remember about [Mr. Kapa] is he

was constantly complaining about the medication. They're giving him the wrong medication."

Additionally, Mr. Diaz testified that Mr. Kapa "complained daily about his medication."

(Plaintiff's Exhibit 11, John Diaz Deposition, 23:13-24:12).  Regarding thoughts of self-harm,

Lamont Bullock testified that on the day he died, Mr. Kapa told Defendant Greenleaf he was

going to kill himself (Plaintiff's Exhibit 4, Lamont Bullock Deposition, 17:20-18:3), and

Greenleaf responded that he didn't give a fuck. (Plaintiff's Exhibit 4, Lamont Bullock

Deposition at 17:20-18:3).  Subsequently, Mr. Kapa twice cried out to Defendant Kuhns, but

Kuhns ignored Mr. Kapa's cries and walked away without saying anything. (Plaintiff's Exhibit 4,

Lamont Bullock Deposition, 18:25-19:10).

203.    In response to paragraph 203 of MHM Defendants' Statement of Facts, Plaintiff

disputes the statements contained therein.  Defendant Kuhns testified that he was surprised to

learn of Joseph Kapa's death because "there was nothing that he did at all that day."  However,

Lamont Bullock testified that on June 25, 2007, the day Joseph Kapa died, Mr. Kapa "cried out"

to Defendant Kuhns twice, but Kuhns ignored Mr. Kapa both times and walked away without

saying anything. (Plaintiff's Exhibit 4, Lamont Bullock Deposition, 18:25-19:10).  Additionally, John Diaz testified that on the day Mr. Kapa died, he asked Defendant Kuhns to see the psychiatrist.  (Plaintiff's Exhibit 11, John Diaz Deposition, 28:18-29:11).

204.    In response to paragraph 204 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

205.    In response to paragraph 205 of MHM Defendants' Statement of Facts, Plaintiff admits that Defendant Nasrallah ***testified*** as to the statements contained therein.

206.    In response to paragraph 206 of MHM Defendants' Statement of Facts, Plaintiff disputes the statements contained therein.  First, in the quoted portion of Defendant Nasrallah's deposition, he was referring to whether checks are done more often than every 30 minutes.  He was not commenting on whether guards "merely walk through the RHU when they do their 30 minute checks."  Second, John Diaz testified that it was not unusual for guards to do their 30-minute rounds, but not look into anyone's cell, or for guards to come around once an eight hour shift and check in to the check point multiple times. (Plaintiff's Exhibit 11, John Diaz Deposition, 29:18-29:11).

207.    In response to paragraph 207 of MHM Defendants' Statement of Facts, Plaintiff admits that Defendant Nasrallah ***testified*** as to the statements contained therein.

208.    In response to paragraph 208 of MHM Defendants' Statement of Facts, Plaintiff admits that Defendant Nasrallah ***testified*** as to his opinion of such.

209.    In response to paragraph 209 of MHM Defendants' Statement of Facts, Plaintiff admits that Defendant Nasrallah ***testified*** as to his opinion of such.

210.     In response to paragraph 210 of MHM Defendants' Statement of Facts, Plaintiff admits that Defendant Nasrallah ***testified*** as to his opinion of such.

211.     In response to paragraph 211 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

212.     In response to paragraph 212 of MHM Defendants' Statement of Facts, Plaintiff admits that Officer Greenleaf ***testified*** as such.

213.     In response to paragraph 213 of MHM Defendants' Statement of Facts, Plaintiff admits that Officer Greenleaf ***testified*** as such.

214.     In response to paragraph 214 of MHM Defendants' Statement of Facts, Plaintiff admits that Officer Greenleaf ***testified*** as such.

215.     In response to paragraph 215 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

216.     In response to paragraph 216 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

217.     In response to paragraph 217 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

218.     In response to paragraph 218 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

219.     In response to paragraph 219 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

220.    In response to paragraph 220 of MHM Defendants' Statement of Facts, Plaintiff admits that Stacy Thompson Troutman **testified** as to the statements contained therein.

221.    In response to paragraph 221 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

222.    In response to paragraph 222 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

223.    In response to paragraph 223 of MHM Defendants' Statement of Facts, Plaintiff admits the statements contained therein.

224.    In addition to the facts set forth by the Commonwealth Defendants, Plaintiff adds additional facts to make the record complete.

225.    Doctor Dominguez testified: "When he stayed at POC, he was raising, threatening behavior that, if he gets out of POC he will harm himself.  And to me, when he checks himself from Rockview Mental Health Center, it's clear to me that he doesn't like to get help.  So when he said that he's threatening to harm himself when he gets out POC, that seems like a manipulative behavior, because he's been in POC for 10 days and checks himself out, so he doesn't- it's clear that he doesn't like to get help.  So, I have to look at the whole picture of his behavior, his demeanor.   And he was eating, drinking; he has been compliant with his medication; his goal directive is logical, and he's not verbalizing any feeling of worthlessness, uselessness.   He doesn't verbalize any specific plan of committing suicide at all, so it's- it doesn't have the- all the legitimate reason for him to stay in POC.  So, he has to go to RHU with 15-minute check on 72 hours.  The guard has to check every 15 minute, and if there's any concern or that he is actively suicidal, homicidal, they can get in touch with the psychologists,

with the nursing staff, or anybody, including me, so I can go back and evaluate him immediately." (Plaintiff's Exhibit 34, Dominguez Deposition II, 139:10-140:20).

226.   Doctor Dominguez testified: "Just the one that he's saying I want to- I want to harm myself if I get out of POC, and he just stayed there for many, many days.  And he went to Rockview.  He has the chance to get a fortunate opportunity for intensive treatment, but he refused to stay.  So what's the meaning of that?  He doesn't want to get help.  He just come here and say, I want to stay in POC.  I will kill myself if I get out of POC.  Why didn't he stay in Rockview if he really wanted to get help?  That's clear, very clear." (Plaintiff's Exhibit 34, Dominguez Deposition II, 146:24-147:10).

227.   On June 21, 2007, Mr. Kapa threatened to commit suicide by hanging himself and was re-admitted to the POC.  (Plaintiff's Exhibit 17, Administrative Custody Placement, 6/21/2007).

228.    On June 22, 2007, Mr. Kapa was released from the POC to the RHU.  (Plaintiff's Exhibit 10, Joseph Kapa DC-17X Forms from POC dated 6/22/2007).

229.    Dr. Polmueller characterized Mr. Kapa as "notorious throughout the correctional system through his shenanigans."  He also testified he believed Mr. Kapa threatened suicide to avoid punishment.  (Plaintiff's Exhibit 33, Polmueller Deposition, 132:17-133:18).

230.    Dr. Polmueller also characterized Mr. Kapa as holding himself hostage, that is, if MHM staff didn't do things the way he wanted, Mr. Kapa would hurt himself.  (Plaintiff's Exhibit 33, Polmueller Deposition, 185:4-185:25).

231.    Dr. Polmueller testified, "When people are on the 72-hour step-down from POC to RHU, they are seen daily by the psychology staff."   (Plaintiff's Exhibit 33, Polmueller Deposition, 188:22-189:5).

232.    The "Psychiatric Observation Monitoring Forms" which purported to document Mr. Kapa every fifteen minutes for the last eleven days of his life, except when entries were missing, showed that Mr. Kapa was not seen by a psychological or psychiatric professional from 6/22/2007 to his death on 6/25/2007.  (Plaintiff's Exhibit 8, Psychiatric Observation Monitoring Forms dated 6/14/2007 through 6/25/2007)

233.    It is the responsibility of the psychiatrist to schedule follow up visits with inmates released from the POC.  (Plaintiff's Exhibit 2, Palakovich Deposition, 89:5-89:13).

234.    Defendant Bauer testified when asked if he, as the psychiatrist, had to follow up with an inmate at the end of the 72-hour suicide watch by the guards: "Well, I should, but if the staff tells me that they behaved well, cooperated with the routine, so well took them off, is that okay?  Well, very good."  (Plaintiff's Exhibit 40, Bauer Deposition, 106:1-106:6).

235.    Defendant Bauer testified when asked if there was a method by which the staff would tell him whether the inmate behaved: "Well, if there was a need, whenever I came to work they flooded me.  Hey, be sure you do that because that fellow is still symptomatic and in danger of hurting himself.  So I would go and see him and then probably continue some more.  But if there is no report of misbehavior or dangerous behavior or psychotic behavior well, let's see what happens without that, not renew it."  (Plaintiff's Exhibit 40, Bauer Deposition, 106:7-106:16).

236.   Defendant Bauer testified: "I thought it was a good staff at that prison.  I could depend on them, and they could depend on me to be there and help out."  (Plaintiff's Exhibit 40, Bauer Deposition, 106:19-106:22).

237.   MHM and DOC official policy dictates that "every suicide attempt, including gestures, shall be taken seriously."  (Plaintiff's Exhibit 5, Access to Mental Health Care Manual, p. 25).

238.   Mental health staff (institutional and contract) ignored or minimized Mr. Kapa's distress attributing it to manipulation rather than conducting a thorough assessment, even when correctional staff returned him to the POC within a day of an earlier release.  (Plaintiff's Exhibit 14, Expert Report of Kathryn Burns, p. 6).

239.   MHM staff assessed Joseph Kapa as not being suicidal, with "no problem" despite his repeated suicide threats and suicide attempts.  (Plaintiff's Exhibit 9, DC-17X RHU Forms, dated 6/20/2007 through 6/25/2007; Plaintiff's Exhibit 10, DC-17X POC Forms, dated 6/14/2007 through 6/22/2007).

240.   The standard of care provided by MHM to suicidal inmates constitute substantial departures from professional standards in evaluating and treating prison inmates at risk of suicide.  (Plaintiff's Exhibit 14, Expert Report of Kathryn Burns, p. 6).

241.   Dr. Polmueller ignored or minimized Mr. Kapa's distress attributing it to manipulation rather than conducting a thorough assessment, even when correctional staff returned him to the POC within a day of an earlier release.  (Plaintiff's Exhibit 14, Expert Report of Kathryn Burns, p. 6).

242.    Mr. Kapa went five days without food in the POC, missing a total of fifteen meals.  (Plaintiff's Exhibit 10, Joseph Kapa DC-17X Forms dated 6/14/2007 through 6/22/2007).

243.    Dr. Mellon wrote in his progress notes that Mr. Kapa was "not depressed and exhibited no psychotic symptoms."   (Plaintiff's Exhibit 35, Mellon Progress Note dated 6/20/2007).

244.    Dr. Mellon wrote in his progress notes that Mr. Kapa was "anxious and fast talking, 'almost hypomanic."  (Plaintiff's Exhibit 35, Mellon Progress Note dated 6/20/2007).

245.    After Mr. Kapa was seen by Dr. Mellon on 6/20/2007, Dr. Polmueller provided a verbal order for Mr. Kapa's discharge from the POC.  (Plaintiff's Exhibit 36, Progress Note dated 6/20/2007).

246.    Official prison policy states, "an inmate shall only be discharged from a POC upon being assessed by the psychiatrist or physician and only upon written order by the psychiatrist or physician…Verbal or telephonic orders are not acceptable." (Plaintiff's Exhibit 5, Access to Mental Health Care Manual, sec. 3-2).

247.    After Mr. Kapa threatened to hang himself and was admitted to the POC for the second time, he was only kept under observation in the POC for one day before he was released back to the RHU.  (Plaintiff's Exhibit 10, Joseph Kapa DC-17X Forms dated 6/14/2007 through 6/22/2007).

248.    The Access to Mental Health Care Manual for SCI-Smithfield states that "the staff shall be aware of the increased risk of suicide for an inmate released from a POC and shall

be conservative in discharging him."  (Plaintiff's Exhibit 5, Access to Mental Health Care Manual, sec. H3e7).

249.    Releasing Joseph Kapa from the POC after one day of observation since his last suicide threat was not conservative.  (Plaintiff's Exhibit 14, Expert Report of Kathryn Burns, p. 6).

250.    Mr. Kapa was last visited by a psychiatrist on June 22, 2007, three days before his death.  (Plaintiff's Exhibit 8, Psychiatric Observation Monitoring Forms 6/22/2007 through 6/25/2007).

251.    Mr. Kapa was still supposed to be on fifteen minute observations when he committed suicide.  (Plaintiff's Exhibit 8, Psychiatric Observation Monitoring Forms, dated 6/22/2007 through 6/25/2007).

252.    Defendant Bauer wrote in an Inpatient Unit Summary about Mr. Kapa, "He will again get so angry- impulsive- not safe for himself or others.  If it happens again, which it will, we know more how to manage the storm."  (Plaintiff's Exhibit 30, Inpatient Unit Summary of Dr. Bauer).

253.    Mr. Kapa was tentatively approved for parole but he received a misconduct on 6/14/2007, which if not reduced, might bar his possibility of parole.  (Plaintiff's Exhibit 15, Misconduct Report 6/14/2007).

254.    While in the POC, an official "Misconduct Hearing" was held, and Mr. Kapa was found guilty of refusing to obey an order.  (Plaintiff's Exhibit 25, Disciplinary Hearing Report, 6/18/2007).

255.    Although Mr. Kapa appealed his misconduct by pleading for leniency in order to maintain his parole status, he was never informed of the Board's decision to reduce his misconduct and maintain his prospect for parole.   (Plaintiff's Exhibit 20, Form DC-135A #000204, Request to Mills).

256.   Mr. Kapa was released from the POC on June 20, 2007 at 7:52 p.m. (Plaintiff's Exhibit 8, Psychiatric Observation Monitoring Form dated 6/20/2007).

257.    Twelve Hours later, at 7:50 a.m., Joseph Kapa again threatened to hang himself and was taken back to the POC.  (Plaintiff's Exhibit 17, Administrative Custody Placement DC-141 Form dated 6/21/2007).

258.   Joseph Kapa stayed in the POC until approximately 6:00 p.m. on 6/22/2007. (Plaintiff's Exhibit 8, Psychiatric Observation Monitoring Forms, dated 6/22/2007).

259.   The standard of care MHM provided to Mr. Kapa fell below the medically accepted standard.  (Plaintiff's Exhibit 14, Expert Report of Kathryn Burns, p. 6).

260.   MHM contracted with the DOC to provide psychiatric care to inmates based on a "community standard of care."  (Plaintiff's Exhibit 32, MHM Proposal to Provide Mental Health Care Services Alternative III-4, submitted May 1, 2003, pp. 379-380.)

261.   At one point, although Dr. Polmueller realized that Joseph Kapa was receiving an incorrect level of medications for his diagnosis, he continued Mr. Kapa on those medications. (Plaintiff's Exhibit 37, Polmueller Progress Notes).

262.   Dr. Dominguez testified of Joseph Holguin's decision to leave the Rockview Mentual Health Unit, "I'm just angry with what he did.  He needed help, and I want him to get help."  (Plaintiff's Exhibit 34, Dominguez Deposition II, 180:19-180:20).

263.  Dr. Dominguez testified of Clifford Finney, "He was claiming he's still suicidal but unable to tell me the plan."  (Plaintiff's Exhibit 39, Dominguez Deposition I, 222:20-222:21).

264.  Dr. Dominguez testified of Clifford Finney, "Ultimately he's giving me mix signal, I have to take account the whole picture of Mr. Finney.  So it's okay for him to go to RHU with 15 minute observation in camera cell for 72 hours, unless there is staff available 24 hours."  (Plaintiff's Exhibit 39, Dominguez Deposition I, 223:5-223:9).

Respectfully Submitted,

*/s/ Lesa S. Gelb*
LESA GELB LAW, P.C.
480 Pierce Street Suite 304
Kingston, PA 18704
(570) 288-7022

Date: May 4, 2011

# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOSEPH KAPA, Sr.,

Plaintiff,

v.

JOHN PALAKOVICH, *et al.,*

Defendants.

No. 1:09-CV-371

(Judge Rambo)
***Electronically Filed***

## CERTIFICATE OF SERVICE

I, Lesa S. Gelb, hereby certify that on May 4, 2011, I caused to be served a true and correct copy of the foregoing Plaintiff's Counter Statement of Facts in Response to the Statement of Amended Statement of Material Facts of Defendants MHM Correctional Services, Inc. and Franz Bauer, M.D. to the following:

## VIA ELECTRONIC FILING

Patrick S. Cawley
Deputy Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120
*Counsel for Defendants Palakovich, Weaver Smeal, Greenleaf, Nasrallah, and Kuhns*

Samuel H. Foreman, Esquire
Weber, Gallagher, Simpson
Stapleton, Fires & Newby LLP
603 Stanwix Street, Suite 1450
Pittsburgh, PA 15222
*Counsel for Defendants Bauer and MHM Correctional Services, Inc.*

*/s/ Lesa S. Gelb*
Lesa S. Gelb
Counsel for Plaintiff

45