## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOSEPH M. KAPA,** | : | |
| **Plaintiff** | : | **No. 1:09-CV-0371** |
| | : | |
| **v.** | : | |
| | : | |
| **JOHN A. PALAKOVICH,** *et al.*, | : | **J. Rambo** |
| **Defendants** | : | |
| | : | |

### M E M O R A N D U M

Before the court are two motions for summary judgment. (Docs. 60 & 65.) The first motion, (Doc. 60), was filed by Defendants Greenleaf, Palakovich, Smeal, Weaver, Nasrallah and Kuhns (the "Commonwealth Defendants"). The second motion, (Doc. 65), was filed by Defendants Mental Health Management Correctional Services, Inc. ("MHM") and Doctor Franz Bauer (the "Medical Defendants"). For the reason discussed below, the Medical Defendants' motion will be granted and the Commonwealth Defendants' motion will be granted in part and denied in part.

I.         **Background**[1]

    A.      **Parties**[2]

Plaintiff is the father of Decedent Joseph Kapa, Jr., and brings this lawsuit against the above-named Defendants as the administrator of his estate.

John Palakovich was the Superintendent of the State Correctional Institution at Smithfield ("SCI-Smithfield"), where Kapa was housed, from August 2003 to December 2007. (Commonwealth Defs.' Statement of Material Facts ("SMF") ¶ 1.) George Weaver was the Health Care Administrator at SCI-Smithfield from 1993 to November 2008. (*Id.* ¶¶ 3,6.) Weaver was the liaison between the DOC and staff members contracted through the medical department.

Wade Kuhns was a Sergeant at SCI-Smithfield in 2007. (*Id.* ¶ 37.) Paul Nasrallah was a corrections officer assigned to the Restricted Housing Unit ("RHU") at SCI-Smithfield in 2007. (*Id.* ¶ 29.) Craig Greenleaf was a corrections officer assigned to various blocks throughout SCI-Smithfield in 2007. (*Id.* ¶ 43.)

MHM contracts with the Pennsylvania Department of corrections to provide psychiatric and psychological care to inmates. Dr. Franz Bauer was a psychiatrist employed by MHM from 2003 to March 2007.

---

[1]      In *Forbes v. Twp. of Lower Merion*, 313 F.3d 144, 148–49 (3d Cir. 2002), the Third Circuit reaffirmed its supervisory rule first announced in *Vadino v. A. Valey Engineers,* 903 F.2d 253, 259 (3d Cir.1990) that "the district courts in this circuit [must] accompany grants of summary judgment hereafter with an explanation sufficient to permit the parties and this court to understand the legal premise for the court's order." *Vadino*, 903 F.2d at 259. Here, the court will identify those facts that are subject to genuine dispute, and cite to the record in order to highlight the precise nature of any disputed facts. The court will not cite to the record where the facts are undisputed; instead, the court will rely on the statements of material fact and admissions submitted by the parties. The materiality of any genuinely disputed facts will be analyzed in the discussion section below.

[2]      In his brief in opposition to the Commonwealth Defendants' motion for summary judgment, Plaintiff voluntarily dismisses Defendant Paul Smeal from this case. (Br. Opp. Mot. for Summ. J., Doc. 80, at 1.)

B.     **Facts**

1.     **Kapa's Mental Health History**

Joseph Kapa, Jr. entered the Pennsylvania Department of Corrections on September 28, 1992.  (Medical Defs.' SMF ¶ 1.)  At that time, Kapa exhibited no depression or psychotic symptoms, but began receiving treatment for restlessness and anxiety.  (*Id*. ¶ 2.)  Kapa continued to receive treatment off and on for various diagnoses while incarcerated.  He was diagnosed throughout his prison term with, *inter alia*, borderline personality disorder with antisocial traits, depression with psychosis, conversion disorder, impulse control disorder, substance abuse in forced remission, and bipolar disorder.  Prison psychiatrists placed Kapa in a psychiatric observation cell ("POC") numerous times during his incarceration for medical issues and for threats of self harm or harm to others, (*Id*. ¶¶ 4, 13, 17, 25, 28, 32, 39, 52, 56, 64, 73, 84)  including an apparent attempted suicide by hanging in December 2002 (*Id*. ¶ 33).

Kapa was seen by various psychiatric staff members during his incarceration, but the only medical staff who is a party to this case is Dr. Bauer, whose treatment of Kapa will be discussed at greater length below. In the weeks leading up to his death Kapa was in and out of the POC.  Specifically, on June 14, 2007, Kapa was admitted to the POC, where doctors disagreed over the diagnosis of his mental issues.  (*Id*. ¶ 105.)  While in the POC at that time, Kapa made comments to medical staff of his desire to end his life by hanging or cutting himself.  (*Id*. ¶ 106.)  He later denied having these thoughts of self harm.  Kapa was released from the POC on June 20, 2007, but returned on June 21, 2007, when he threatened to hang himself if left in his cell.  Once in the POC, Kapa again denied having suicidal thoughts.  On June 22, upon being cleared by the Program Review Committee

("PRC"), Kapa left the POC and returned to the RHU.  At this time, Kapa was being prescribed Elavil, Dilantin, Valproic Acid, Prozac and Klonopin.[3]  (*Id.* ¶ 105.)

## 2.    The Day of Kapa's Death

Kapa was released from the POC to the H Block RHU on June 22, 2007.  (Commonwealth Defs.' SMF ¶67.)  Officers in the RHU observed Kapa every fifteen minutes from June 22, 2007, through June 24, 2007.[4]  (*Id.* ¶ 68.)  On June 24, Kapa complained to officers on the 2 p.m. to 10 p.m. shift about his medications. (*Id.* ¶ 70.)

On June 25, the day of Kapa's suicide, Defendants Kuhns, Nasrallah, and Greenleaf worked the 6 a.m. to 2 p.m. shift in the H Block RHU.  (*Id.* ¶¶ 37, 40, 41.)  On that date, an inmate, Thomas Smith, observed Kapa arguing with a female nurse about his medication.  (Pl.'s Ex. 38, at 14:22.)  Smith observed Defendant Kuhns, who was escorting the nurse, say to Kapa, "well, if you feel that way, then go ahead and take your life."  (*Id.* at 15:2-3.)  Lamont Bullock, another inmate on the H Block RHU on June 25, 2007, observed Kapa say to Defendant Greenleaf that Kapa was going to kill himself, to which Greenleaf responded "go ahead; that he didn't give a F."  (Commonwealth Defs.' Ex. J, at 17:25.)  Defendant Greenleaf denied this conversation took place.  (Pl.'s Ex. 22, Greenleaf Depo., at 13:9-14.)  Bullock also stated that he (Bullock) told Defendant Greenleaf that Kapa was going to harm or kill himself, and that the officers should "do something about that." (Pl.'s Ex. 4, at 11-

---

[3] Elavil and Prozac are used to treat depression.  Prozac is also used to treat obsessive compulsive disorder and panic attacks.  Delantin is use to treat and prevent seizures.  Valproic Acid is also used to treat seizures, as well as mania and bipolar disorder.  Klonopin is also used to treat seizures, as well as panic attacks.  (*See* U.S. Nat'l Library of Medicine, PubMed Health, www.ncbi.nlm.nih.gov, *last visited* Oct. 12, 2011.)

[4] Although Psychiatric Observation Monitoring Forms from this time period indicate observations were performed every fifteen minutes, Plaintiff disputes that these observations actually occurred.  Plaintiff does not cite any document in the record that supports this contention.

12.)  That same day, Bullock claims he heard Kapa cry out to Defendant Kuhns twice.  Although Bullock does not recall what Kapa cried out, he observed Kuhns ignore Kapa's cries and walk away without saying anything.  (Commonwealth Defs.' Ex. J, at 18:25 & 19:1-2.)  Defendant Kuhns refutes this fact claiming Kapa never called out to him.  (Pl.'s Ex. Depo., at 46:2-7.)

On June 25, 2007, no fifteen minute observations were conducted on Kapa between 1 p.m. and 2 p.m.  (Doc. 81, Pl.'s SMF ¶ 118.)  When the 2 p.m. to 10 p.m. shift took over on the H Block RHU that day, Defendant Kuhns, the sergeant of the 6 a.m. to 2 p.m. shift, did not report anything as being out of the ordinary to the incoming officers.  (Commonwealth Defs.' SMF ¶ 81.)  Plaintiff refutes the veracity of this statement.  (Doc. 81, Pl.'s SMF ¶81.)  Fifteen minute checks on Kapa resumed at 2 p.m.  According to the observation forms, Kapa lay on his bunk during the 2, 2:15, and 2:30 p.m. observations, and sat at his desk eating an apple at 2:45 p.m.  (Pl.'s Ex. 8, Psychiatric Observation Monitoring Form, June 25, 2007.)  At approximately 3 p.m., officers found Kapa hanging from the top bunk rail in his cell by a sheet tied into a noose.  (Commonwealth Defs.' SMF ¶ 91.)

### 3.    Roles of Supervisory Defendants Palakovich and Weaver in Kapa's Care

Defendant Palakovich was the Superintendent of SCI-Smithfield from August 2003 through December 2007.  George Weaver was the Health Care Administrator and was the liason between the DOC and contracted staff in the medical department.  Plaintiff admits that Palakovich did not make medical decisions regarding inmates, but disputes the same for Weaver because it was Weaver's job to review inmate grievances in connection with medical decisions and/or medication.  (Commonwealth Defs.' SMF ¶ 7; Pl.'s SMF ¶ 7.)  Defendants agree that all inmate grievances regarding the medical department were reviewed by Weaver, but the

parties dispute when Weaver actually "used" all the means he had available to investigate grievances, or merely "had access to" means to investigate grievances. (Commonwealth Defs.' SMF ¶ 8; Pl.'s SMF ¶ 8.)  The court finds this to not be a material fact seeing as Plaintiff points to nothing in the record in this case to indicate Weaver "had access to" but did not "use" the resources available to him to investigate grievances he received, specifically grievances from Kapa.

On May 5, 2007, Kapa sent a grievance to Palakovich complaining he had been assaulted by guards while housed in the Allegheny County Prison and that staff were not responding to his inmate request slips for medical and psychiatric help due to this assault.[5]  (Doc. 81, Pl.'s SMF ¶ 128.)[6]  Palakovich responded to Kapa's request by stating "[y]ou have been seen by the medical and psychological staff and they will address yoru [sic] medical issues.  Appeal dismissed." (*Id.* ¶ 129.)

On May 7, 2007, Kapa again wrote to Palakovich stating "I am still suffering and urinating blood.  Along with other problems as well . . . The officers in EB have been trying to get me to see psych and medical for almost two weeks and got no response.  They the officers said there has been a major change in my behavior since my return and no stability in the psyc [sic] department."[7]  (*Id.* ¶ 130.)

---

[5]  In this regard, the record indicates that Kapa was seen by psychiatric staff on April 20, 2007; April 23, 2007; May 1, 2007; May 7, 2007; May 15, 2007; and May 31, 2007.  (Medical Defs.' SMF ¶¶ 98, 99, 101-04; Doc. 85, Pl.'s SMF 99, 101.)  However, the record indicates that the psychiatrists involved in Kapa's care had differing views regarding his psychological diagnoses.  (*Id.* ¶ 100.)

[6]  These facts are taken from Plaintiff's Statement of Material Facts which were submitted beyond those provided by Defendants and to which Defendants did not have a chance to address in their own Statement of Material Facts.  However, Defendants Palakovich and Weaver, in their reply brief to their motion, do not necessarily dispute the facts but note that none of Kapa's grievances to Palakovich or Weaver indicate his intention to commit suicide.  For reasons more fully explained below, the court agrees but for background will still outline Kapa's grievance requests.

[7]  As noted above, Kapa was seen by the psychiatric department this same day, and was also seen the two previous and subsequent weeks as well.  No other medical professionals or professional

(continued...)

Palakovich responded on May 8, 2007, but did not address Kapa's complaint regarding his failure to be seen by the psychiatric department. (*Id.* ¶ 131.)

On May 12, 2007, Kapa wrote a grievance to Palakovich stating that he should not have been sent back to SCI-Smithfield because he had been assaulted in the Allegheny County Jail, and thus, should have remained at that facility. (*Id.* ¶ 132.) Palakovich responded on May 15, 2007, claiming that SCI-Smithfield could refuse to accept Kapa back from Allegheny County because Kapa was serving a state imposed sentence. (*Id.* ¶ 133.)

On June 23, 2007, Kapa wrote to Palakovich one last time stating that no one from the State Police had contacted him regarding his Allegheny County Jail assault allegations and asking that a recent misconduct he had received be reduced. (*Id.* ¶ 136.) Palakovich responded on June 26, 2007, that Kapa needed to contact the Allegheny County District Attorney's office regarding his assault, and that his misconduct had been reduced to a Class 2. (Pl.'s Ex. 13, Allegheny Grievance Packet, at 24.)

As for Defendant Weaver, Kapa wrote to him on April 25, 2007, complaining about physical injuries as a result of the Allegheny County Jail assault. (Pl.'s SMF ¶ 139.) Weaver responded on May 9, 2007, stating that although he found "it hard to believe that Allegheny County staff assaulted you on purpose," it was not an issue because Kapa's medical needs were being taken care of by staff at SCI-Smithfield. (Pl.'s Ex. 13, Allegheny Grievance Packet, at 4.)   In addition, Weaver informed Kapa that if it was found that there was merit to Kapa's assault claims, the DOC would take corrective action. (*Id.*) Weaver also told Kapa that the

---

[7](...continued)
agencies are a party to this case, and therefore, the court will not, and frankly cannot, address the adequacy of Kapa's physical medical care.

safest place for him was at Smithfield and that Weaver was "glad [Kapa] was back." (*Id.*)

On April 24, 2007, Kapa again wrote Weaver stating that his mind was racing, and that he was having trouble because there was no permanent psychiatrist currently in place at SCI-Smithfield and his medication was therefore being frequently changed.  (Pl.'s SMF ¶ 141.)  On May 9, 2007, Weaver responded with the following, "I respect your concern to have a long term psychiatrist to provide you care.  However, psychiatrist care may be provided by using several physicians.  As I review your medical record I find that you have seen the psychiatrist four times since returning to Smithfield on 4/16.  Therefore your need is fulfilled.  Your grievance is dismissed without ruling on merit, for you are asking for a personal preference — having one long term physician to manage your medication.  We can not always provide this personal preference."  (Pl.'s Ex. 13, Allegheny Grievance Packet, at 2.)

On May 9, 2007, Kapa wrote to Weaver regarding his medication "my meds keep getting changed and switched which has me on a rolorcoaster [sic] of emotions.  No permenent [sic] phsyc [sic] etc . . . no stability [sic].  I'm urinating blood on a daily basis along with back, rib, neck, emotional and mental sufferring [sic].  My block COs tried for almost two wks [sic] to have me seen to know [sic] avail.  They said theve [sic] seen a major decline in my behavior since my return etc . . ."  (Pl.'s Ex. 13, Allegheny Grievance Packet, at 22.)  In his response dated May 21, 2007, Weaver addressed Kapa's physical medical concerns and, in addition, regarding Plaintiff's mental health, Weaver wrote, "Your psychotropic medications have been changed several times. Several different psychiatrists have seen you.  Be advised that several psychiatrists have provided Smithfield with service in the last few months.  Since the ordering of medications is under the sole responsibility of the doctors, you need to tell them your desire to stay with the same medications.  I

cannot change your medications, but I do agree with your point of view.  I will mention your concern to our current doctor.  Untimely [sic], you need to talk with the doctor on your visits and tell him/her of your concern."  (Pl.'s Ex. 13, Allegheny Grievance Packet, at 23.)

### 4.   Dr. Bauer's Treatment of Kapa

Kapa was first seen by Dr. Franz Bauer on November 21, 2003. (Medical Defs.' SMF ¶ 62.)  At that time Kapa was under a lot of personal stress and was threatening harm if he were housed with another inmate.  Accordingly, Dr. Bauer recommended a temporary single-cell order and diagnosed Kapa as having impulse control disorder.  (*Id.*)  Dr. Bauer again saw Kapa on December 22, 2003, during which time it was noted that Kapa seemed to be having impulse control issues and wanted to leave without waiting for prescriptions to be filled.  (*Id.* ¶ 63.)  On January 9, 2004, Kapa threatened self-harm and was admitted to the POC by Dr. Bauer.  (*Id.* ¶ 64.)  Plaintiff remained in the POC for five days, and upon discharge Dr. Bauer noted "[Patient] was kept safe.  He will return to his block.  He will again get so angry— impulsive— not safe for himself [and] others . . . . If it happens again, which it will, we know more how to manage the storm."  (Pl.'s Ex. 30, Inpatient Unit Summary of Dr. Bauer, at 2.)  On January 14, 2004, Dr. Bauer again saw Kapa.  At this meeting Kapa stated, "I play no game — I have not eaten in the chow hall since April 16, '03; I'm going to cut up under my arms, side of my neck, the back of my legs.  I don't have to eat."  (Medical Defs.' SMF ¶ 68.)  In response to this Dr. Bauer wrote, "[w]e are not playing games, but we are watching him doing his thing — to get out of POC . . . He wants to maintain a stance of control!"  (*Id.*)  Two days later, on January 14, 2004, Kapa was eating again and stating that he wished to leave the POC.  (*Id.* ¶ 69.)  In addition, Kapa received a dismissal of previous misconduct charges and was now stating he was no longer suicidal.  (*Id.*)  On this date, Dr. Bauer

also saw Kapa and noted "[d]ifferent attitude today, he started eating, wants to return to the general population." (*Id.* ¶ 70.) Kapa was not threatening self-harm and he was released from the POC.

When Dr. Bauer saw Kapa again on January 30, 2004, he was mildly manic but was not expressing suicidal thoughts. Dr. Bauer made a plan to see Kapa again in thirty days. (*Id.* ¶ 71.) This follow-up was conducted on February 25, 2004, during which time Kapa refused medication but had no suicidal ideation. (*Id.* ¶ 72.)

On March 18, 2004, Kapa was again admitted to the POC after cutting both of his arms saying he tried to kill himself but the razor was too dull. He claimed that the staff was "having fun at his expense." (*Id.* ¶ 73.) On March 19, 2004, Dr. Bauer saw Kapa noting his mood was defiant and demanding and that his emotions were not in control. Kapa also told Dr. Bauer "I wish I had finished it." (*Id.* ¶ 77.) After calming down in the POC, he claimed he was no longer self destructive and was released on March 22, 2004. It was the opinion of Dr. Bauer that Kapa enjoyed the attention he received when acting out. In addition, he believed Kapa was "attention-seeking" and chose not to order medication for Kapa because he did not want Kapa to think he was a "star performer." (*Id.* ¶ 79.)

Dr. Bauer saw Kapa again on May 3, 2004. Kapa did not want medication and Dr. Bauer wrote as his future plan to "help [Kapa] get out and stay there!" (*Id.* ¶ 80.) Dr. Bauer again visited Kapa on June 21, 2004, and noted that Kapa was "full of vigor" and looking for a job upon his release. Dr. Bauer made a plan to see Kapa again in sixty days. (*Id.* ¶ 81.) On August 13, 2004, Dr. Bauer followed up with Kapa again. Kapa said he still did not want medication, and Dr. Bauer agreed to see him in ninety days. (*Id.* ¶ 82.) Dr. Bauer saw Kapa again on November 2, 2004, and he claimed to have a positive attitude towards his upcoming release. Dr. Bauer said he would see him again in ninety days. (*Id.* ¶ 83.)

On December 27, 2004, Dr. Bauer admitted Kapa to the POC due to impulse control disorder and conflicts with other inmates in his block.  When Kapa originally arrived at the POC he did so voluntarily, asking for a transfer to another institution, but not explaining his reasons.  He denied suicidal ideation.  Kapa had skipped eight meals, but eventually agreed to drink a nutritional supplement so he could be released from the POC.  (*Id.* ¶ 86.)  Dr. Bauer noted Kapa was "habitually controlling what he [could] get away with and more . . . we cooperated with him to avoid conflicts with other inmates he has or had conflicts with."  On December 29, 2004, Kapa was discharged into a different cell.  (*Id.* ¶ 84.)

Dr. Bauer saw Kapa again on March 23, 2005.  He seemed excited about his upcoming release in May.  Kapa also requested he be prescribed Sinequan and Trazodone, which Dr. Bauer agreed to, noting Kapa seemed to be having "release anxiety."  (*Id.* ¶ 87.)

In preparation for Kapa's parole, Dr. Bauer completed a psychiatric evaluation of Kapa on April 5, 2004.  This evaluation stated that Kapa was not on any medication, and stated that he did not want to be on medication, but had been diagnosed with impulse control problems/disorder, heavy substance abuse in the past, and cluster B personality disorder.  (*Id.* ¶ 88.)  Dr. Bauer again saw Kapa on April 7, 2005, and noted that he was experiencing "department excitement" for which he was prescribed Benadryl to help him sleep.  (*Id.* ¶ 89.)  When Dr. Bauer saw Kapa on June 30, 2005, Kapa stated he was going home in five days and just wanted to be sedated, requesting a Sinequan prescription.  Dr. Bauer wrote that he was sociable and thankful for his care and "promised not to come back.  He was here for 20 years.  I wish him well!!!"  (*Id.* ¶ 90.)  After this, Kapa was released from prison.  (*Id.* ¶ 91.)

Dr. Bauer did not see Kapa again until November 22, 2006, when Kapa was returned to prison due to a parole violation.  Kapa was upset and wanted to be placed back on Benadryl and Trazodone, a request which Dr. Bauer granted.  He noted he was in a "high tension life style" and planned to see him again in thirty days.  (*Id.* ¶ 92.)  On December 28, 2006, Dr. Bauer saw Kapa again.  Kapa said he was stressed and wanted more medication to help him sleep.  Dr. Bauer noted that Kapa was on edge and "got angry almost instantaneously."  (*Id.* ¶ 93.)  His principle diagnosis was borderline personality disorder, although he was also diagnosed with a mood disorder.  Dr. Bauer ordered him Benadryl and agreed to return in thirty days.  (*Id.*)  On January 29, 2007, Dr. Bauer saw Kapa one final time.  His mood seemed positive and he was hoping to be released within the year.  Kapa wished to remain on the medication he was currently on, a request Dr. Bauer obliged.  (*Id.* ¶ 94.)  On February 28, 2007, Kapa was seen by a *locum tenens* physician.  Kapa explained he wanted to change the time at which he took his sleep medicine.  The physician told him he should wait until Dr. Bauer returned, which would be in four weeks.  However, for reasons not entirely clear from the record, Dr. Bauer would not return to work again at this facility.  Kapa was seen by other physicians not a party to this case between February 2007 and his suicide in June 2007.

### 5.   Policies at SCI-Smithfield

At SCI-Smithfield, inmates are rated for mental health purposes on a scale from A to D.  (Commonwealth Defs.' SMF ¶ 11.)  Inmates with a rating of C may have some mental health issues and might be on medication.  (*Id.* ¶ 12.)  Inmates with a rating of D have serious mental health issues and are usually on psychotropic medications.  (*Id.* ¶ 13.)  Inmates with C and D ratings are assigned to the Psychiatric Review Team which is made up of a psychiatrist, psychologist,

psychology manager, a unit manager and nurses.  The Team meets regularly with the inmates.  (*Id.* ¶¶ 14, 15.)

In addition, all staff members at SCI-Smithfield are required to attend annual suicide training.  (*Id.* ¶ 16.)  However, Plaintiff disputes that this training was always carried out, pointing to the deposition of Defendant Palakovich where he says he attended approximately thirty annual training sessions out of a possible thirty-five.[8]  (Commonwealth Defs.' Ex. A, at 40:25.)

SCI-Smithfield also has psychiatric observation cells ("POC") where inmates with mental health problems can be monitored.  (Commonwealth Defs.' SMF ¶ 17.)  Prison procedure dictates that inmates who express suicidal thoughts are automatically placed in a POC.  Plaintiff does not dispute that this is the prison's policy, but disputes that this policy is actually followed.  (Commonwealth Defs.' SMF ¶ 19; Doc. 81, Pl.'s SMF ¶ 19.)  Corrections officers are placed in the POC to monitor inmates with mental health problems.  (Commonwealth Defs.' SMF ¶ 21.)  A psychiatrist must give approval before a prisoner can be released from the POC, and DOC policy dictates that staff members should be conservative before releasing prisoners.  Inmates released from the POC are to be placed on fifteen minute observation and/or continuous video monitoring for a minimum of seventy-two hours.  (Pl.'s Ex. 6, DOC Procedures Manual, Policy Num. 6.5.1, at 2690.)

A program review committee ("PRC") meets with inmates in the POC once a week and makes recommendations regarding whether an inmate should be released back to the RHU, although the ultimate decision to release an inmate from

---

[8]  Without further explanation, Palakovich states that "[t]here were periods of time I wasn't required to attend them."  (Commonwealth Defs.' Ex. A, at 40:25, 41:1.)

the POC is made by a psychologist.[9]  (Defs.' SMF ¶ 28; Doc. 81, Pl.'s SMF ¶ 28.)
On June 20, 2007, the PRC recommended Kapa be release from the POC back to the
RHU with the restriction that he not be allowed razor blades for shaving.
(Commonwealth Defs.' SMF 29.)

When an inmate is placed in the RHU from the POC, a standard suicide
risk indicators checklist is completed.  (Commonwealth Defs.' SMF ¶ 32.)  Although
DOC policy indicates that these checklists are to be completed every time an inmate
is transferred from the POC to the RHU, Plaintiff disputes this practice is followed
because Kapa was removed twice in one week from the POC to the RHU, yet only
one suicide risk indicators checklist is on the record.  (Pl.'s SMF ¶ 32.)  In addition
to the checklist, a psychiatrist makes rounds in the RHU on a daily basis, however,
not every inmate is seen on a daily basis.  (Commonwealth Defs.' SMF ¶ 34; Pl.'s ¶
34.)

C.    **Procedural History**

On February 27, 2009, Plaintiff filed his original complaint in this case.
(Doc. 1.)  On May 22, 2009, an amended complaint was filed.  (Doc. 15.)  The
amended complaint named as Defendants — Palakovich, Smeal, Greenleaf,
Nasrallah, Khuns, Weaver, Prison Health Services ("PHS"), MHM and Dr. Bauer.

On May 15, 2009, PHS filed a motion to dismiss the amended
complaint.  (Doc. 16.)  However, PHS failed to file a supporting brief, as such, the
motion was deemed withdrawn by order dated June 19, 2009.  (Doc. 18.)  On June 1,
2009, and June 22, 2009, respectively, Commonwealth Defendants and MHM filed
answers to the amended complaint.  (Docs. 17 & 19.)  Bauer filed an answer on July
15, 2009.  (Doc. 28.)

---

[9]     Smeal was the only Defendant in this case on the PRC in 2007.  As previously
stated, Plaintiff has voluntarily dismissed Smeal from this case.

On June 29, 2009, PHS filed another motion to dismiss, this time including a brief in support.  (Docs. 22 & 23.)  Plaintiff filed a brief in opposition on July 7, 2009.  (Doc. 25.)  On August 22, 2009, PHS filed a notice of Intention to Enter Judgment of Non Pros for Plaintiff's Failure to File a Certificate of Merit. (Doc. 30.)  After a case management conference on September 3, 2009, Plaintiff was allotted sixty days within which to file a certificate of merit with regard to PHS. (Doc. 34.)  In addition, PHS was given until September 11, 2009, to file a reply brief in support of the motion to dismiss.  (*Id.*)  On September 17, 2009, PHS filed its reply brief.  (Doc. 38)  On November 23, 2009, a stipulation was filed by Plaintiff dismissing PHS from this case.  (Doc. 39.)  The stipulation was approved that same day by the court.  (Doc. 40.)

On January 25, 2010, Plaintiff filed a motion for extension of time to complete discovery.  (Doc. 42.)  The court granted this motion on January 26, 2010. (Doc. 43.)  On July 16, 2010, a joint motion for extension of time was filed by the parties (Doc. 48) and was granted on July 21, 2010 (Doc. 49).  On January 27, 2011, Medical Defendants filed a motion for extension of time to file dispositive motions, (Doc. 56), which the court granted that same day (Doc. 57).  On January 31, 2011, Medical Defendants filed a second motion for extension of time to file dispositive motions.  (Doc. 58.)  This motion was granted on February 1, 2011.  (Doc. 59.)

On February 1, 2011, Commonwealth Defendants filed a motion for summary judgment and brief in support.  (Docs. 60 & 64.)  Also on February 1, 2011, Medical Defendants filed a motion for summary judgment, (Doc. 65), and a brief in support the following day (Doc.66).  On February 15, 2011, Plaintiff filed a motion for extension of time to respond to both summary judgment motions.  (Doc. 68.)  The court granted this motion on February 18, 2011.  (Doc. 69.)  Three subsequent motions for extensions of time were filed by Plaintiff.  (Docs. 74, 76, 78.)

The court found one to be moot, (Doc. 75), however the court granted the other two (Docs. 77 & 79).

On May 6, 2011, Plaintiff filed a brief in opposition to the Commonwealth Defendants' motion for summary judgment.  (Doc. 80.)  On May 10, 2011, Plaintiff filed a brief in opposition to the Medical Defendants' motion for summary judgment.  (Doc. 84.)  On May 20, 2011, both sets of Defendants filed motions for extension of time to file reply briefs, (Docs. 87 & 88), which were granted on May 23, 2009 (Docs. 89 & 90).  On May 31, 2011, all Defendants filed reply briefs.  (Docs. 91 & 92.)  As such, the motions are now ripe for disposition.

## II.        **Legal Standard**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the nonmoving party.  *Id.* at 248.  The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party.  *Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Upon such a showing, the burden then shifts to the non-moving party to

present "specific facts showing the existence of a genuine issue for trial." FED. R. CIV. P. 56(e). The non-moving party may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324 (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322-23. "'Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.'" *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

## III.        Discussion

Plaintiff brings this action as administrator of the Estate of Joseph Kapa Jr., pursuant to 42 U.S.C. § 1983, alleging violations of Kapa's Eighth and Fourteenth Amendment rights by subjecting him to cruel and unusual punishment through deliberate indifference to his serious medical needs.

Commonwealth Defendants argue that Plaintiff cannot establish that the Commonwealth Defendants knew of and disregarded Kapa's particular vulnerability to suicide, and thus there exists no issue of material fact for which a deliberate indifference to Kapa's serious medical needs can be based upon.

Medical Defendants argue that they are entitled to summary judgment because Kapa received adequate psychiatric treatment while at SCI-Smithfield, Dr. Bauer had last treated Kapa six months before Kapa committed suicide, and Plaintiff

has failed to show a custom, policy or practice by MHM of ignoring prisoner's serious medical needs.

In order to state a valid claim under 42 U.S.C. § 1983, a plaintiff must allege two elements: 1) that the conduct complained of was committed by a person acting under color of state law, and 2) that the conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution and laws of the United States. *West v. Atkins*, 487 U.S. 42, 48 (1988). The defendant's conduct must have a causal connection to plaintiff's injury in order for § 1983 liability to attach. *Martinez v. California*, 444 U.S. 277, 285 (1980). Furthermore, for liability to attach, it must be shown that a defendant directed, or knew of and acquiesced in, the deprivation of a plaintiff's constitutional rights. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207-08 (3d Cir. 1988). In this case, there is no dispute that Defendants were acting under color of state law. Therefore, only the deprivation of a right, privilege or immunity under the Constitution need be discussed.

In the Third Circuit, the deliberate indifference of a defendant that leads to a prisoner's suicide can constitute a valid Eighth Amendment claim under Section 1983 if a plaintiff establishes the following three elements: "(1) the detainee had a particular vulnerability to suicide, (2) the [defendant knew of and disregarded that vulnerability],[10] and (3) those [persons] acted with reckless indifference to the

---

[10] The Third Circuit in *Colburn v. Upper Darby Twp.*, 946 F.2d 1017 (3d Cir. 1991), articulated the second prong of the test as whether the defendant "knew or should have known" of the prisoner's vulnerability, *id.* at 1023, but that standard has been modified by the Supreme Court. In *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court held that a defendant cannot be found liable under the Eighth Amendment "unless the officer knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837. Thus, the *Colburn* test has been re-characterized to conform to the standard established by the Supreme Court. Other courts have likewise held that the plaintiff in a prison suicide case must show that "'defendant: (1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk.'" *Minix v. Canarecci*, No. 09-2001, 2010 WL 668893, at *4 (7th Cir., Feb. 26, 2010); *accord, Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006); *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005).

detainee's particular vulnerability." *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991) (citations omitted).

Although "reckless indifference" is not easily defined, courts have made clear that "mere negligence on the part of prison officials is insufficient to establish a claim pursuant to § 1983." *Kulp v. Veruete*, 267 F. App'x. 141, 143 (3d. Cir. 2008); *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 320 (3d. Cir. 2005) (explaining that the Eighth Amendment does not impose "liability for a negligent failure to protect a detainee from self-inflicted injury."). In addition, the Third Circuit has held that "plaintiffs must show that suicide was a 'strong likelihood, rather than a mere possibility.'" *Id.* at 143-44 (citing *Colburn v. Upper Darby Twp.,* 946 F.2d 1017, 1024 (3d Cir. 1991)).

In addition, medical malpractice is not sufficient to establish an Eighth Amendment claim, nor is "[m]ere disagreement as to the proper medical treatment." *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (citing *Monmouth Cnty. Corr. Inst. Inmates v. Lazaro*, 834 F. 2d 326, 346 (3d Cir. 1987)).

In the instant case, a reasonable trier of fact could conclude that Kapa had a particular vulnerability to suicide.[11] He had been in and out of the POC at least fifteen times since the beginning of his incarceration. On multiple occasions he threatened or attempted self harm, including cutting himself with a razor and an attempt at hanging himself in December 2002. After one failed attempt, he told Dr. Bauer he "wished [he] had finished it." (Medical Defs.' SMF ¶ 77.) He had been prohibited from having razors after he was released from the POC. From at least March 2005, Plaintiff had been prescribed multiple antidepressants and medications

---

[11] Defendants MHM and Dr. Bauer do not argue the first and seconds elements of the test, and instead only discuss whether these Defendants were recklessly indifferent in their actions. The Commonwealth Defendants argue that the evidence shows Kapa used suicidal comments to manipulate staff in order to avoid disciplinary sanctions or be placed in a different area of the prison.

to treat seizures, anxiety, mania and bipolar disorder, as well as medication to help him sleep.  On June 14, 2007, a little over a week before committing suicide, he had been placed in the POC where he told staff he wanted to end his life by either cutting or hanging himself.  Based on this evidence, the court finds a reasonable jury could conclude that Kapa had a particular vulnerability to suicide and the first element has been satisfied for purposes of ruling on these motions to dismiss.

In addition, a reasonable trier of fact could conclude that the Defendants in this case knew, or should have known, of Kapa's particular vulnerability to suicide.  Kapa's long history of suicidal tendencies as well documented.  He had been in and out of the POC multiple times and was known by all the prison guards on duty that day.  Defendants Palakovich and Weaver exchanged correspondence on multiple occasions relating to Kapa's care and mental state.  Defendant Nasrallah stated that he "[knew] there have been times where Kapa has told [Nasrallah] he was going to kill himself."  (Pl.'s Ex. 23, Nasrallah Depo., at 35:9-12.)  Defendant Kuhns stated that he recalled "Kapa was in and out of the POC all the time."  (Pl.'s Ex. 21, Kuhns Depo., at 15:4-5.)  In addition, although Defendant Greenleaf was not of the opinion that Kapa was the type of individual who would take his own life, he was aware that Kapa had been placed in the POC before.  (*Id.*, at 18:24-25, 19:1.)  In addition, Dr. Bauer had been treating Kapa on and off beginning in 2003 and continuing until six months before Kapa's death.  During this time, Kapa was in and out of the POC due to threats of suicide and suicide attempts.  Because of these circumstances, the court finds that a reasonable jury could conclude that Defendants were aware of Kapa's vulnerability to suicide.

As for whether the Defendants acted with deliberate indifference to Kapa's serious medical need, the court will address the Defendants separately.

## A.    Defendant Palakovich

The court does not believe that a reasonable trier of fact could conclude that Defendant Palakovich was deliberately indifferent to Kapa's serious medical needs.  Defendant Palakovich responded to all Kapa's inmate request slips within days of Kapa having written them.  Kapa's request slips generally centered around the fact that he was not receiving the mental and physical medical treatment he deserved after the incident at Allegheny County Prison.  In addition, Kapa was concerned that his allegations against Allegheny County Prison were not being properly addressed by authorities.  Palakovich's first response to Kapa's request slip on May 5, 2007, denied Kapa's request for medical and physiological help because, according to the response, Kapa had already been examined by the medical and psychological staff.  In fact, the record supports Palakovich's statement and indicates that Kapa's medical concerns were being actively addressed.  For example, on April 27, 2007, a Dr. Polmeuller made a note that staff had reported Kapa was upset with the time at which his medication was dispensed to him.  (Medical Defs.' SMF, ¶ 99.)[12]  Dr. Polmeuller believed Kapa was suffering from adjustment disorder.  (*Id.*) Dr. Polmeuller was also concerned that the medication Kapa was currently being prescribed might not be proper for treating this diagnosis.  Nonetheless, Dr. Polmeuller agreed to continue the medication for the time being and to order a TCA level test and an EKG and requested that the psychiatrist call him.  Dr. Polmeuller was concerned that Kapa might be over-medicated in relation to his actual diagnosis. (*Id.*) To explain, Dr. Polmeuller stated:

---

[12]  Plaintiff disputes this fact only to the extent that Plaintiff claims the fact that Dr. Polmeuller continued Kapa's medications evidences the poor standard of care given to inmates. However, a difference of opinion as to medical treatment is not sufficient to establish reckless indifference to a serious medical need.  *See Bacon v. Carroll*, 232 F. App'x. 158, 160-61 (3d Cir. 2007 (quoting *Inmates of Allegheny Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) stating "courts will disavow any attempt to second-guess the propriety of adequacy of a particular course of treatment . . . which remains a question of sound professional judgment.")

> Basically, that my concern was that he was seeing different providers, and he was getting put on medications that were in excess of what he should be for his symptomology.  That when a guy like Kapa paints pictures of gloom and doom for the practitioners, they are tempted to be more aggressive with medication treatment.  So I want them to have the benefit of my experience with Mr. Kapa over the years . . . . They're treating him for adjustment disorder. . . . With heavier-duty medications then [sic] would be appropriate for an adjustment disorder, so I'm doing two things here.  I'm making sure that he's not being put at risk by too heavy-duty medications by getting the level and the EKG, and asking him for face to face instead of just the staff telling me something on the 27[th], and then asking the psychiatrist to call me, which is not documented here whether that occurred or not on 5/1/07.

(Medical Defs.' SMF ¶ 100.)

On May 1, 2007, a Dr. Mellon saw Kapa and said although Kapa was not displaying any psychotic symptoms, he was complaining about his inability to sleep and the change in his medications.  On the previous day, April 30, 2007, Mellon had ordered a prescription for Trazadone based on his belief that Kapa was bipolar, however, this prescription was cancelled on May 2, 2007.  Dr. Mellon also made a note that he believed Kapa was "Not Stable."  (Medical Defs.' SMF ¶ 101; Doc. 85, Pl.'s SMF ¶ 101.)  Dr. Mellon saw Kapa again on May 7, 2007, two days after Kapa sent his initial inmate grievance slip to Palakovich and the same day Kapa had sent a second inmate grievance slip to Palakovich.  (Medical Defs.' SMF ¶ 101.) Dr. Mellon continued to believe that Kapa had never properly been treated for bipolar disorder and made the decision to start treatment for the prognosis that day. In addition, Dr. Mellon noted that Kapa was being treated for blood in his urine which was the result of an alleged assault at the Allegheny County Prison.  (*Id.* ¶¶ 101, 102.)  All this supports Palakovich's assertion in his denial of Kapa's request slip that Kapa was already examined and evaluated by medical and psychological staff.

On May 12, 2007, Plaintiff sent another grievance to Palakovich complaining about his return to SCI-Smithfield.  This complaint did not mention any risk of suicide, and was responded to by Palakovich on May 15, 2007.  Additionally, on June 23, 2007, Kapa sent a grievance request slip to Palakovich that mentioned the Allegheny County Prison assault and his recent misconduct violation, but mentioned nothing about a risk of suicide.  Palakovich responded to this request on June 26, 2007, the day after Kapa's death.

Based on these facts, the court cannot conclude that Defendant Palakovich was deliberately indifferent to Kapa's serious medical needs.  Although a reasonable trier of fact may be able to conclude that Palakovich was aware of Kapa's long history of mental illness, there is nothing in the record to show Palakovich was deliberately indifferent to Kapa's needs.  Each inmate grievance slip submitted by Kapa was promptly responded to by Palakovich.  Furthermore, the record indicates that, contrary to Kapa's grievances that he had not been seen by a psychiatrist, Kapa had in fact been evaluated regularly by mental health staff.  Although the psychiatric department may have reached different conclusions as to Kapa's exact diagnosis, he was nevertheless being treated on a regular basis.  Furthermore, Defendant Palakovich, is Superintendent of the prison and is not a medical doctor or psychiatrist, and thus would not have been able to diagnose Kapa's condition.  As such, there is no genuine issue of material fact regarding whether Defendant Palakovich displayed reckless indifference to Kapa's serious medical needs and the Commonwealth Defendants' motion for summary judgment will be granted with respect to Defendant Palakovich.

### B.   <u>Defendant Weaver</u>

Likewise, the record is devoid of facts showing that Defendant Weaver was recklessly indifferent to Kapa's serious medical needs.  Unlike Palakovich,

Defendant Weaver was directly responsible for reviewing inmate grievance slips relating to medication or medical care and for facilitating communication between DOC and MHM staff.

Kapa wrote to Defendant Weaver on April 25, 2007, complaining about physical injuries he sustained in an alleged assault at the Allegheny County Prison. Weaver responded with doubts regarding the alleged assault, but indicated Kapa's medical needs would be taken care of at SCI-Smithfield.  No mention of suicide was made.  On April 24, 2007, Kapa wrote again, this time stating that his "mind was racing" and expressing concern that his medication was being changed often due to the high over-turn in the psychiatric department.  Weaver responded on May 9, 2007, stating that Kapa had been seen by psychiatric staff four times since his return to SCI-Smithfield on April 16, 2007, and therefore his psychiatric medical needs were being met.  In additon, Weaver stated that although he understood Kapa's preference to have one long-term physician handling his medication, such a preference could not always be met.

On May 9, 2007, Kapa wrote again complaining about his ever-changing medication and claiming it was putting him on a "rollercoaster" of emotions and that staff had noticed a decline in his behavior.  Weaver responded May 21, 2007, stating:

> Your psychotropic medications have been changed several times. Several different psychiatrists have seen you.  Be advised that several psychiatrists have provided Smithfield with service in the last few months.  Since the ordering of medications is under the sole responsibility of the doctors, you need to tell them your desire to stay with the same medications.  I cannot change your medications, but I do agree with your point of view.  I will mention your concern to our current doctor.  Untimely [sic], you need to talk with the doctor on your visits and tell him/her of your concern.

(Pl.'s Ex. 13, Allegheny Grievance Packet, at 23.)  This is the last communication on the record between Kapa and Weaver.

The court does not believe these facts indicate Weaver acted with reckless indifference to the serious medical needs of Kapa.  Although the record seems to indicate that Weaver was sympathetic to Kapa's mental situation, and therefore, may have known of Kapa's particular vulnerability to suicide, nothing indicates Weaver was recklessly indifferent to this vulnerability.  For instance, Weaver was responsive to Kapa's grievances.  Moreover, Weaver was not responsible for prescribing, reducing or making any changes to Kapa's medications.  Weaver informed Kapa he would follow-up with the psychiatric department, and the record indicates Kapa was seen regularly by psychiatric staff during this time period.  In addition, the inmate grievances on record in this case indicate Kapa was concerned with his changing medication and the impact it might be having on his mental state, but no specific mention of the fear of suicide was made.  Defendant Weaver informed Kapa that he needed to talk to his doctor about his medication.  Weaver also stated that he would contact the psychiatric department about Kapa's concerns.  The proper diagnosis of Kapa and subsequent treatment were in the proper purview of the medical staff, not Weaver, and there is nothing in the record to indicate Weaver failed to respond to Kapa's inmate grievance requests or was otherwise recklessly indifferent to Kapa's vulnerability to suicide.  As such, the Commonwealth Defendants' motion for summary judgment will be granted as to Defendant Weaver.

## C.   **Defendant Nasrallah**

The record is devoid of any facts indicating Defendant Nasrallah was recklessly indifferent to Kapa's serious medical needs.  Nasrallah stated that he does not recall if he received request slips from Kapa on the day that he died, but if he had, he would not have read them if they were addressed to someone else and instead would have delivered them to their intended destination. (Pl.'s Ex. 23, Nasrallah Depo., at 13:17-23.)  Nasrallah did not know what medication Kapa was on, but that if Kapa had expressed a problem with his medication, it would have been noted by Nasrallah.  (*Id.*, at 23:6-14; 34:17-20.)  In Nasrallah's opinion, Kapa was the type of individual who would claim to be suicidal in an attempt to get out of the RHU and into the POC for some "quiet time."  (*Id.*, at 31:15-25 & 32:1.)  However, on the day of Kapa's death, Nasrallah indicated Kapa did not display any behavior that would have caused Nasrallah to report anything to the psychology or psychiatry staff.  (*Id.*, at 34:3-7.)  To Nasrallah, it seemed like a normal day during which Kapa and Nasrallah were joking around.  (*Id.*, at 34:10-14.)  Nasrallah further stated that if Kapa had told him he was going to kill himself on June 25, 2007, or in the previous days "[Kapa] wouldn't have been there.  He would have been down at POC.  I would have immediately told sarge, sat by his door like we've done before."  (*Id.*, at 35:1-4.)  Furthermore, Nasrallah stated "I know there have been times before where Kapa has told me he was going to kill himself, and when he did I would have sat there until he got to go to the POC."  (*Id.*, 35:9-12.)

Based on this evidence, there is no genuine issue of material fact surrounding Nasrallah's indifference to Kapa's vulnerability to suicide.  There is no evidence that Kapa expressed any concerns to Nasrallah regarding his change in medication or his fear of self-inflicted harm on or before the day of his death.  In fact, Nasrallah had experienced Kapa's threats of suicide and was familiar with the

procedures that were followed when an inmate threatened self harm.  In those instances, the record reflects that Nasrallah followed those procedures with Kapa. There is no genuine issue of material fact regarding whether Nasrallah was deliberately indifferent to Kapa's serious medical needs.  As such, the Commonwealth Defendants' motion for summary judgment will be granted as to Defendant Nasrallah.

### D.    **Defendants Kuhns and Greenleaf**

Defendants Kuhns and Greenleaf present a different scenario.  With regard to both these Defendants, evidence has been submitted that on the day of Kapa's death, there is a genuine issue of material fact regarding whether Kapa made them aware that he was threatening suicide.

On the day of Kapa's death, inmate Thomas Smith claims he heard Kapa complaining to a nurse about his medication.  Defendant Kuhns was escorting the nurse to whom Kapa was complaining.  Although it is unclear what words were actually exchanged between Kapa and the nurse, inmate Smith claims he heard Defendant Kuhns respond with "well, if you feel that way, then go ahead and take your life." (Commonwealth Defs.' Ex. I, at 15:1-2.)  Defendant Kuhns denies this conversation took place.  In addition, inmate Lamont Bullock claims he heard Kapa cry out to Kuhns twice on the day he committed suicide, but that Defendant Kuhns ignored Kapa.[13]  (Commonwealth Defs.' Ex. J, at 18:15-19:1-3.)

With regard to Defendant Greenleaf, inmate Bullock claims that on the morning Kapa committed suicide, Kapa yelled out from his cell that he was going to harm himself.  (*Id.*, at 11:14-15.)  Bullock claims that he told Defendant Greenleaf

---

[13]  Bullock does not recall what exactly Kapa cried out, and Kuhns does not remember hearing Kapa yell for him.  Nor is there anything on the record to suggest these cries had anything to do with Kapa's eventual suicide.  However, coupled with the statement inmate Smith claims he heard from Kuhns, the court believes that what Kapa yelled out, if anything, is a factual issue for the jury.

that Kapa was going to kill himself and Greenleaf should "do something about that." (*Id.*, at 11:17-18.)  Bullock also heard Kapa tell Greenleaf he was going to kill himself.  (*Id.*, at 13:2-3.)  In response, Bullock claims Greenleaf told Kapa "go ahead; [I don't] give a F."  (*Id.*, at 17:25 & 18:1.)  Greenleaf denies these exchanges took place.  The court believes there is a genuine issue of material fact regarding whether Defendant Greenleaf was told by Kapa or other inmates that Kapa was going to kill himself on June 25, 2007.  As such, the Commonwealth Defendants' motion will be denied with regard to Defendants Kuhns and Greenleaf.

## E.   **Defendant Bauer**

Based on the record, there is no genuine issue of material fact regarding the psychiatric care Dr. Bauer provided Kapa.  The following facts indicate that Dr. Bauer was not recklessly indifferent to Kapa's psychiatric needs.

Dr. Bauer started providing psychiatric care to Kapa in 2003.  The first time Dr. Bauer saw Kapa, Kapa was threatening self-harm if he had to share a cell with someone.  Accordingly, Dr. Bauer immediately ordered a temporary single cell for Kapa.  Dr. Bauer saw Kapa several times over the next three months because Kapa was feeling mentally unstable and threatened self-harm on at least one occasion after which he was placed in the POC.  In January 2004 alone, Kapa was seen by Dr. Bauer three times and was admitted and released from the POC after each visit.

Dr. Bauer saw Kapa in February 2004, and noted that he was manic but not expressing suicidal thoughts.  Dr. Bauer made a plan to see Kapa in thirty days. In March 2004, Dr. Bauer again saw Kapa three times and admitted and released him from the POC due to threats of suicide.

Dr. Bauer saw Kapa again in May and noted that his future plan with Kapa was to help him "get out and stay there."  Dr. Bauer visited Kapa again in June. Dr. Bauer noted that Kapa's mood seemed to be elevated and Dr. Bauer decided to

come back in sixty days, which he did.  After sixty days, Kapa still did not want to take medication and Dr. Bauer decided to come back in ninety days, which was the beginning of November.  When Dr. Bauer saw Kapa in November, he had a positive attitude and was looking forward to being released.

In December 2004, Kapa asked to be admitted to the POC due to impulse control issues and trouble with other inmates.  Kapa refused to eat meals, but claimed he was not suicidal.  Dr. Bauer noted that Kapa had control issues, and was only admitted to the POC to avoid conflict.  At the end of December, Kapa was released from the POC.

Dr. Bauer did not see Kapa again until March, at which point Kapa requested medication and Dr. Bauer noted he seemed to be having "release anxiety." In April 2004, Dr. Bauer prepared an evaluation of Kapa for the parole board.  It stated that Kapa was not on medication, and did not wish to be placed on medication, and also included an evaluation of Kapa's mental conditions.  Also in April, Kapa requested sleep medication.  Dr. Bauer prescribed him Benadryl.  In June 2004, Dr. Bauer saw Kapa for the final time before Kapa's initial release.  He requested medication so he could be sedated for the following five days leading up to his release.  Dr. Bauer noted that Kapa was sociable, thankful for his care, and promised not to return to prison.

Dr. Bauer's discontinued treatment until Kapa returned to prison on a parole violation in November 2006.  At this time, Kapa requested he be placed back on medication.  Dr. Bauer saw him every month through January 2007, when Dr. Bauer's employment with SCI-Smithfield ceased.  Kapa committed suicide six months later.

From this, the court fails to see how Dr. Bauer was recklessly indifferent to Kapa's serious medical needs.  He saw Kapa consistently, prescribed

medication when Kapa requested it, and worked with Kapa when he did not wish to be on medication.  Kapa was admitted to the POC every time he threatened suicide, and was not discharged until he ate meals and stated he was not having suicidal thoughts.  Dr. Bauer's treatment of Kapa ceased six months prior to Kapa committing suicide.  Kapa had six months to be re-diagnosed and placed on new medication.  The period of time between Dr. Bauer's treatment of Kapa and Kapa's subsequent suicide is simply too attenuated for a reasonable trier of fact to conclude that the actions of Dr. Bauer directly led to the Kapa's suicide.  As such, the Medical Defendants' motion for summary judgment will be granted with regard to Dr. Bauer.

## F.   **Defendant MHM**

MHM is a private corporation that contracts with the state of Pennsylvania to provide mental health treatment for inmates at SCI-Smithfield.  A private corporation contracting with a state cannot incur § 1983 liability by way of *respondeat superior.  See Natalie v. Camden County Corr. Facility*, 318 F.3d 575, 583-84 (3d Cir. 2003); *see also Monell v. Dep't of Sec. Servs.*, 436 U.S. 658, 691-94 (1978) (holding that a municipality may not be held liable under § 1983 on a theory of *respondeat superior*).  In order to hold a private corporation liable under § 1983, a plaintiff must show that he suffered a constitutional deprivation resulting from an official corporate policy or custom.  *See Natalie*, 318 F.3d at 583-84 (applying *Monell* to Prison Health Services- an MHM-like corporation that provides medical care to the prisons).  A policy is an official proclamation or edict, while a custom is "so permanent and well settled as to virtually constitute law."  *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (quoting *Andrews v. City of Phila*, 895 F.2d 1469 1480 (3d Cir. 1990) (citations omitted)).

There is nothing in the record to indicate that Defendant MHM had a policy or practice in place to deprive inmates psychiatric care.  In fact, Plaintiff

admits that MHM had policies in place relating to potentially suicidal inmates, but claims it was the *actual* policy of MHM to disregard an inmates potential for suicide and release them from the POC despite that risk.  Tellingly, Plaintiff's brief in opposition to the Medical Defendants' motion to dismiss cites to only one fact to show that the policy or custom of MHM was to ignore an inmate's vulnerability to suicide — namely, the fact that Dr. Polmeuller believed Kapa was manipulative and used threats of suicide to get what he wanted.  (Doc. 84, Pl.'s Br. Opp. to Medical Defs.' Mot. for Summ. J., at 17.)  Although this remark may seem callous in light of the fact that Kapa did eventually take his own life, this does not establish that it was the policy or custom of MHM to not treat inmates who had a vulnerability to suicide. MHM provided suicide training to prison officials and had trained psychology staff at SCI-Smithfield at all relevant times.  Any actions, or inactions, taken by either prison officials or psychology staff merely represents a violation of MHM's established policies for treating mentally ill inmates.  MHM cannot be held liable under a *respondeat superior* theory and there is simply nothing in the record to indicate MHM had a policy or practice of failing to treat mentally ill inmates. Furthermore, even if MHM had been negligent in their training of staff, mere negligence is not sufficient to establish a violation of the Eighth Amendment and the Medical Defendants' motion for summary judgment will be granted as to MHM.

**IV.**        <u>Conclusion</u>

       For the reasons stated above, the court finds that there is no genuine issue of material fact as to Defendants Palakovich, Weaver, Nasrallah, Dr. Bauer and MHM regarding whether these Defendants were deliberately indifferent to Kapa's serious medical needs, and summary judgment for these Defendants will be granted. In contrast, the record shows that there is conflicting testimony regarding whether

Defendants Kuhns and Greenleaf were aware of and deliberately disregarded Kapa's serious medical needs and, as such, summary judgment will be denied as to these Defendants.  An appropriate order will issue.


         s/Sylvia H. Rambo
          United States District Judge

Dated:  November 14, 2011.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPH M. KAPA, | : | |
| **Plaintiff** | : | No. 1:09-CV-0371 |
| | : | |
| v. | : | |
| | : | |
| JOHN A. PALAKOVICH, *et al.*, | : | J. Rambo |
| **Defendants** | : | |
| | : | |

## O R D E R

For the reasons set forth in the accompanying memorandum of law, **IT IS HEREBY ORDERED THAT**:

1) The motion for summary judgment (Doc. 60) filed by Defendants Palakovich, Weaver, Smeal, Nasrallah, Kuhns and Greenleaf is granted in part and denied in part as follows:

a) the motion is **GRANTED** as to Defendants Palakovich, Weaver and Nasrallah;

b) the motion is **DENIED** as to Defendants Kuhns and Greenleaf; and

c) the motion is **DEEMED MOOT** as to Defendant Smeal pursuant to Plaintiff's voluntary dismissal of this Defendant in the brief in opposition to the motion.  (Doc. 80, at 1.)  The Clerk of Court shall note the dismissal of this defendant on the docket.

2) The motion for summary judgment (Doc. 65) filed by Defendants Dr. Bauer and MHM is **GRANTED**.

    3)  The clerk of court shall **DEFER** the entry of the grants of summary judgment above until the conclusion of this case.

                             s/Sylvia H. Rambo
                             United States District Judge

Dated:  November 14, 2011.

2